CALIFORNIA PUBLIC BROADCAST-
ING FORUM, et al., Appellants,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

KQED, Inc., Intervenor.

Nos. 82–1235, 83–2105.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 20, 1984.

Decided Jan. 11, 1985.

As Amended Jan. 22, 1985.

David M. Rice, New York City, with whom Barbara S. Brodlieb, New York City, was on brief, for appellants.

C. Grey Pash, Jr., Atty., F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief for appellee. Stephen A. Sharp, Jane E. Mayo, and L. Andrew Tollin, Attys., F.C.C., Washington, D.C., entered appearances for appellee.

Richard D. Marks, Washington, D.C., with whom Daniel W. Toohey and Todd D. Gray were on brief, for intervenor. Carolyn A. Wimbly, Washington, D.C., entered an appearance for intervenor.

Before WRIGHT and WALD, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Opinion concurring in part and dissenting in part filed by Senior Circuit Judge MacKINNON.

J. SKELLY WRIGHT, Circuit Judge:

This case concerns an appeal from a series of Federal Communications Commission decisions not to hold hearings on several petitions to deny renewal of the licenses of KQED, Inc., the owner and operator of public television stations in San Francisco, California. The issue presented is whether the FCC could reasonably have found that the appellants here had not, in their petitions, made specific allegations raising substantial and material questions of fact that would constitute a prima facie showing that renewal of KQED's licenses was not in the public interest. As discussed below, we hold that the Commission's actions were, with one exception, reasonable. With respect to appellants' allegation of KQED misrepresentation to the FCC, however, we find that the FCC's dismissal of this allegation without a hearing was arbitrary and capricious and we therefore reverse and remand for a hearing on that claim.

I. BACKGROUND

KQED holds broadcast licenses for two public television stations (KQED–TV and KQEC–TV) and one FM radio station (KQED–FM) in San Francisco. These licenses currently run for three years at a time, and KQED's renewal schedule has called for renewal applications in 1977, 1980, and 1983.

As with many public broadcasters, KQED is a "member-supported" entity. Appellants in this case, public interest groups and a group representing a faction of dissatisfied members of KQED, first filed a petition to deny renewal of KQED's

broadcast licenses in 1977. In that petition they alleged generally (1) that KQED was betraying its noncommercial status by operating for private gain and by allowing commercial activities to interfere with its obligation to service the community; (2) that KQED had refused to disclose financial information and to open its meetings to the public fully; (3) that KQED was inadequately serving the local news, public affairs, and children's programming needs of the community; and (4) that KQED was not sufficiently pursuing affirmative action policies. *See* Verified Petition to Deny Renewal of Broadcast License, October 28, 1977, *reproduced in* Joint Appendix (JA) at 26–50. They requested not only that KQED's license renewal applications be denied but also that a hearing be held on the factual issues they raised. *See id.* at 25, JA 50.

On May 14, 1980 the Commission denied this petition and granted KQED's 1977 license renewals without a hearing. It held that the allegations did not raise the substantial and material factual questions that, under the applicable statute, 47 U.S.C. § 309(d) (1982), would mandate a hearing on the license renewal and concluded that renewal of the licenses would be in the public interest. *See In re: License Renewal Applications of KQED, Inc. (KQED I)*, 77 FCC2d 973 (1980), JA 1.

On June 10, 1980 appellants filed with the Commission a petition for reconsideration of *KQED I*. In this petition for reconsideration appellants, in addition to pressing their original claims, asserted a new allegation: that KQED had knowingly lied to FCC about its reasons for deactivating KQEC–TV in late 1979 and early 1980. *See* Petition for Reconsideration of Memorandum Opinion and Order FCC 80–245, June 10, 1980, *reproduced in* JA at 235–260.

Before the Commission had ruled on the petition for reconsideration of its decision granting the 1977 license renewals, appellants filed a new petition to deny KQED's 1980 license renewals. This petition to deny, filed on October 30, 1980, made the same allegations as those in the earlier petitions and again requested denial of KQED's license renewal applications (this time the 1980 ones) or at least a hearing on those applications. *See* Petition to Deny, October 30, 1980, *reproduced in* JA at 355–383. Both the petition for reconsideration of *KQED I* and the petition to deny the 1980 license renewals were denied by the Commission on February 2, 1982. *See In Re Applications of KQED, Inc. (KQED II)*, 88 FCC2d 1159 (1982), JA 6. Again, the FCC granted the license renewal applications without a hearing.

On March 4, 1982 appellants filed another petition for reconsideration—this time of *KQED II*, the Commission's denial of the petition to deny the 1980 renewals. *See* Petition for Reconsideration of Denial of Petition to Deny, March 4, 1982, *reproduced in* JA at 620–635. This petition was also denied by the Commission on September 20, 1983. *See In re Applications of KQED, Inc. (KQED III)*, FCC 83–403, *reproduced in* JA at 20–25.

In this consolidated appeal appellants challenge the failure of the FCC to hold hearings before granting KQED's 1977 and 1980 license renewals.[1] Specifically, they argue that three of their claims constituted a showing sufficient to mandate a hearing: (1) the claim that the station made misrepresentations to the FCC regarding its 1979–1980 deactivation of KQEC–TV; (2) the claim that commercial activities conducted by the station interfered to an unacceptable extent with the station's local public interest programming; and (3) the claim that

---

**1.** On March 4, 1982 appellants filed a notice of appeal with this court from the portions of *KQED I* and *KQED II* that dealt with the 1977 license renewals. This appeal was held in abeyance pending FCC disposition of the claims regarding the 1980 license renewal. Then, on October 20, 1983, appellants filed a notice of appeal from the portions of *KQED II* and *KQED*

*III* that dealt with the 1980 license renewals. These two appeals were consolidated by order of this court on November 4, 1983. This consolidated appeal thus deals with the 1977 and 1980 license renewals only. Any proceedings with respect to KQED's 1983 license renewal applications are not at issue.

the station failed to comply with the "open meeting" provisions of the Public Broadcasting Act. 47 U.S.C. § 390 *et seq.* (1982). They contend that the Commission's failure to hold a hearing on these claims was arbitrary and capricious. After noting the applicable statutory provisions and the standard for judicial review, we will consider each of these claims in turn.

## II. Statutory Requirements and Standard for Judicial Review

The Communications Act provides for the granting of a broadcast license by the Federal Communications Commission when the Commission finds that granting the license will serve the "public interest, convenience, and necessity." 47 U.S.C. § 309(a). The Act also provides a mechanism for interested parties to object to the granting of licenses: "Any party in interest may file with the Commission a petition to deny any application [for a broadcast license]." *Id.* § 309(d)(1). In addition, the Act sets up standards for such petitions:

> The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application [for a broadcast license] would be prima facie inconsistent with [the public interest]. Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof. * * *

*Id.* Finally, the Act creates guidelines for the Commission to follow in dealing with such petitions to deny. In the face of such petitions the Commission may grant the license without a hearing, but only if it "finds * * * that there are no substantial and material questions of fact and that a grant of the application would be consistent with [the public interest]." *Id.* § 309(d)(2). If, on the other hand, "a substantial and material question of fact is presented or the Commission for any reason is unable to [find that granting the license is in the public interest], it shall

formally designate the application for hearing * * *." *Id.* § 309(e).

■ This statutory standard puts a heavy burden on a party submitting a petition to deny: For a hearing on the application to be required, the party must, with statutorily required specificity and support, raise controverted factual issues that are substantial and material. First the party must show the requisite *specificity and support.* "The allegation of ultimate, conclusionary facts or more general allegations on information and belief, supported by general affidavits, * * * are not sufficient." *Stone v. FCC,* 466 F.2d 316, 322 (D.C.Cir.1972) (*quoting* S.Rep. No. 690, 86th Cong., 1st Sess. 3 (1959)). *See United States v. FCC,* 652 F.2d 72, 89–90 (D.C.Cir. 1980). Further, the dispute must truly be *factual;* a dispute over the proper inferences to be drawn from agreed-upon facts does not qualify. *See Lakewood Broadcasting Service, Inc. v. FCC,* 478 F.2d 919 (D.C.Cir.1973); *Anti-Defamation League of B'nai B'rith v. FCC,* 403 F.2d 169, 171 (D.C.Cir.1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969), *cited with approval in Columbus Broadcasting Coalition v. FCC,* 505 F.2d 320, 324 (D.C. Cir.1974); *Stone v. FCC, supra,* 466 F.2d at 323. And, finally, the factual issues raised must be *substantial and material.* For, as this court noted recently, "[w]here factual disputes exist, a hearing is not automatically required * * *." *Tele-Media Corp. v. FCC,* 697 F.2d 402, 409 (D.C.Cir. 1983). "[A] hearing is not required to resolve issues which the Commission finds are either not 'substantial' or 'material,' regardless of whether the facts involved are in dispute." *Stone v. FCC, supra,* 466 F.2d at 323. Thus for a hearing on a petition to deny to be required, a dispute must be clearly and adequately alleged, it must be factual, and it must rise to the level of a substantial and material issue.

■ Whether or not a petition to deny has made the showing that, under the statute, will mandate a hearing is a determination which lies, in the first instance, with the Commission. Consequently, judicial re-

view of Commission determinations is very deferential to agency reasoning when the Commission acts within the scope of its expertise: "[T]he scope of our review is quite narrow; we defer to the expertise and experience of the Commission within its field of specialty and would reverse only where the Commission's position is arbitrary, capricious, or unreasonable." *Id.* at 322; *see also Nat'l Ass'n for Better Broadcasting v. FCC*, 591 F.2d 812, 816 (D.C.Cir.1978); *Columbus Broadcasting Coalition v. FCC, supra*, 505 F.2d at 324; *West Michigan Telecasters, Inc. v. FCC*, 396 F.2d 688 (D.C.Cir.1968). Thus where the agency decision appears reasonable and generally supported by the material before it, we will not intervene. We will not, however, hesitate to intervene where the agency decision appears unreasonable or bears inadequate relation to the facts on which it is purportedly based.

In sum, in reviewing this decision of the Commission not to hold a hearing we must not only be mindful of the statutory burden placed on petitioners but also defer to the agency's evaluation of whether that burden has been carried where that evaluation is reasonable. With these considerations in mind, we turn now to the specific allegations made by appellants in this case and the disposition of those allegations by the Commission.

III. ANALYSIS OF FCC DECISION NOT TO HOLD A HEARING UNDER SECTION 309

A. *Claim of Misrepresentation by KQED to FCC*

██ Appellants claim first that their allegations that KQED made misrepresentations to the FCC regarding its decision to "darken" (cease broadcasting) KQEC–TV in late 1979 raised a substantial and material question of fact that mandated a hearing on the license renewal application. The

FCC concluded that it did not. *See KQED II*, 88 FCC2d at 1162, JA 9. Our review of this conclusion examines now whether it can be reasonably supported by a finding that appellants' allegations are not adequate under the standards enunciated above, *i.e.*, insufficiently specific or supported, not presenting a factual dispute, or failing to present a substantial and material factual issue.[2] To review the FCC determination that the allegation had not been made with the requisite specificity requires this court to survey the allegation and supporting affidavits and documentary evidence that were before the FCC when it made its decision.

1. *The allegation as presented by appellants to the FCC.* Since 1971 KQED has owned KQEC–TV, a public television station smaller than the main San Francisco public television station KQED–TV but also located in San Francisco. After acquiring this station in 1971, KQED failed to operate it for almost five years between 1972 and 1977. KQED's initial "darkening" of KQEC–TV in 1972 was due to budgetary problems and was accomplished with the permission of the FCC. *See In Re Applications of KQED, Inc.*, 57 FCC2d 264, 269 (1975). In 1975, however, the FCC ordered KQED to resume operation of KQEC–TV within 90 days, noting that continued suspension of operations at KQEC–TV would not be in the public interest and threatening sanctions if broadcasting were not resumed within the 90-day period. *See id.* Although the immediacy of this order was blunted by FCC's later grant of a nine-month extension of the 90-day limit, *see In Re Application of KQED, Inc.*, 58 FCC2d 751 (1976), the order eventually became effective: In 1977 KQED resumed operations at KQEC–TV.

On November 4, 1979 KQED again darkened KQEC–TV, notifying the Commission

**2.** The Commission contends that our review of its resolution of whether a hearing must be held on a misrepresentation claim should be particularly deferential because of our previous holdings that findings as to misrepresentation are factual findings "peculiarly within" its area of expertise. *See* brief for appellee at 17–18. In

determining whether adequate allegations were made to mandate a hearing, allegations of misrepresentation are no different than any other factual allegations. The language and cases cited by the Commission do not support a different result.

by letter dated November 2, 1979 that the suspension would "enable a master routing switcher to be replaced" and explaining that "[t]he licensee [could not] maintain a separate schedule for KQEC (TV) during this installation." JA at 265. At that time KQED represented to the FCC that the darkening was expected to last only until December 7, 1979. *Id.* KQEC–TV did resume operation for approximately three weeks during December 1979, but KQED again darkened the station for the months of January through May 1980.

The misrepresentation alleged by the appellants in this case centers around KQED's actual reasons for redarkening KQEC–TV during the first five months of 1980 as compared to the representation made at the time by KQED to FCC regarding those reasons. There is no factual dispute here as to the content of the representations made by KQED to FCC during this period. Following its November 2, 1979 notification to the FCC, KQED sent three additional letters to the FCC regarding the status of the KQEC–TV darkening. On December 27, 1979 KQED's counsel wrote to the FCC, again noting that "[t]he suspension of operation was occasioned by the proposed installation of a master routing switcher, replacing previous equipment. Because the switching equipment for both KQED(TV) and KQEC(TV) is part of the same routing system, the licensee was unable to maintain a separate schedule during the installation." JA at 264. This letter further noted that because of installation delays, "station KQEC(TV) [would] be unable to return to the air prior to March 1, 1980." *Id.* On February 25, 1980 another letter from KQED to FCC informed FCC that additional delays in the shipment of the components of the new equipment would make restoration of service during the last week in May a more realistic estimate. *See id.* at 263. Finally, a further letter on April 22, 1980 gave more details on the technical delays and reaffirmed a restoration date at the end of May. *See id.*

at 261. Thus the representations made by KQED to FCC regarding its darkening of KQEC–TV clearly indicated that operation of KQEC–TV was impossible until the master switcher had been replaced and that it was for that reason only that the deactivation had occurred.

While the content of the KQED communications to FCC during this period is not in dispute, the actual reasons for KQED's darkening of KQEC–TV are. Appellants contend that KQED suspended KQEC–TV operation during the first five months of 1980 solely for the generalized budgetary problems that the FCC had warned KQED it could no longer use to justify continued non-operation of the station. That is, they allege that KQED darkened KQEC–TV so as to relieve budgetary constraints with the cost savings achieved by not operating KQEC–TV during this period.[3]

Specifically, appellants allege that at the December 20, 1979 KQED board meeting at which the decision to temporarily deactivate KQEC–TV was made, no mention was made of any relationship between the deactivation and the installation of a master routing switcher and that, in fact, the discussion of the deactivation centered solely on the cost savings that such deactivation would enable. This allegation is supported by a sworn affidavit from Henry Kroll, a former director of KQED who attended the December 20 meeting at which the decision was made. In his affidavit Kroll states that the decision to deactivate KQEC–TV was taken solely as a budgetary measure and that at that time the board contemplated that KQEC–TV would probably remain deactivated through August 31, 1980. *See* JA at 269. And, with respect to the statutory requirements of Section 309(d)(1), the affidavit states that the facts alleged there are of Kroll's personal knowledge. *See* JA at 270.

The Kroll affidavit, it should be noted, contains two distinct factual assertions.

**3.** None of the parties involved in this appeal disputes that KQED was experiencing budget problems at this time.

First, it asserts that the board of directors discussed only general budgetary reasons for deactivating KQEC–TV at the meeting where the decision to deactivate the station was made. Second, it notes that at the time the decision to deactivate was made the board contemplated that the deactivation would probably continue through August 31, 1980. (August 31 is the end of KQED's fiscal year.)

In addition to this direct evidence of the reasons behind the KQED board's December 20, 1979 deactivation decision, appellants have submitted documentary evidence which corroborates the Kroll affidavit. This additional evidence indicates that KQED, at the time in question, consistently told its viewers and members that the deactivation had resulted from budgetary constraints and that it would probably last until the end of August 1980. For example, the board resolution which approved the deactivation of KQEC–TV noted that "whereas it is now necessary to temporarily deactivate [KQEC–TV] for continued budgetary reasons," the board would now contemplate possible options regarding what to do with KQEC—including the options of reactivating it or disposing of it. *See* JA at 267. And the report of the December 20, 1979 board meeting that was contained in the monthly magazine mailed out to members noted that at that meeting "[KQED President] Tiano proposed as a first step toward resolving the deficit [of KQED for the 1979–1980 fiscal year] the cutting of service on [KQEC–TV]." *Id.* President Tiano, in the same issue of the magazine, stated that the recommendation made at the meeting to temporarily deactivate KQEC–TV "followed a review of this year's budget projections and the operating capital deficit the station has been carrying since 1972." *Id.* at 268. Finally, an internal KQED memorandum prepared in February 1980 of "official" responses to frequent viewer complaints stated that "[t]he decision [to take KQEC–TV off the air] was made by the KQED Board of Directors in an effort to help reduce the station's large budget deficit. Official word is that the move is temporary, at least until the end of

Fiscal Year '80, (in September)." *Id.* at 421.

Thus appellants alleged that, while KQED represented to the FCC that the deactivation of KQEC–TV was mandated by the replacement of a master switcher and that it would last only until the switcher was installed (a reactivation date of March 1, 1980 was clearly implied in the December 27, 1979 letter), it in fact had deactivated KQEC–TV as a budget-saving measure that it originally anticipated would last through August 31, 1980, the end of its 1979–1980 fiscal year.

2. *KQED's response and the resulting FCC decision.* When appellants presented this allegation and this supporting evidence to the FCC in their petition for reconsideration of FCC's denial of their petition to deny the 1977 license renewal, KQED responded with the explanation that the budgetary constraints that had been referred to were not the *generalized* budgetary constraints that the station was experiencing at the time but the *extraordinary* ones that would have been created by the additional expense of operating KQEC–TV while the new technical equipment was being installed. *See* Opposition to Petition for Reconsideration, June 25, 1980, at 1–7, *reproduced in* JA at 302–308.

In support of this explanation KQED submitted an affidavit in which KQED President Tiano stated that the budgetary constraints that would have been created by the additional, unbudgeted, expense of $1,000.00 per week that it would have cost to keep KQEC–TV on the air while the master routing switch was being replaced were the budgetary constraints referred to in the documents cited by appellants. *See* JA at 320–322. (This expense resulted from the need to rent additional equipment to replace that which was out of commission.) He also stated that the statements made at the board meeting regarding the deactivation of KQEC–TV related entirely to the need for making long-term plans regarding KQEC–TV's future. *See id.* at 323–324. He noted further that the letters sent to the FCC were in no way misrepre-

sentative of the situation because the delays in reactivating KQEC–TV did, in fact, result entirely (albeit indirectly) from delays in the installation of the new equipment. *See id.* at 321. Finally, he stated that KQED's intention had, from the beginning, been to reactivate KQEC–TV when the equipment had been installed. *See id.* KQED also submitted a second affidavit in which KQED Chief Engineer Zastrow asserted that there had been a need to replace the old equipment and that delivery of the new system had taken much longer than originally anticipated, causing deactivation of KQEC–TV past the planned December 1979 reactivation date until May 29, 1980. *See id.* at 326–330. He also noted the $1,000.00 per week expense of operating KQEC–TV during the replacement period. *See id.* at 328.

Thus the dispute was presented to the FCC. Appellants alleged that KQED had taken KQEC–TV off the air for generalized budgetary reasons in December 1979, and that when it was deactivated in that month deactivation through August 1980 was contemplated. KQED, on the other hand, contended that KQEC–TV had been deactivated because of the extraordinary costs that operating it during the installation of the new equipment would have incurred—additional costs which KQED could ill afford given its ongoing budgetary problems. On both sides, affidavits and/or documentary evidence were presented.

The Commission, after considering the conflicting allegations, concluded "that the shut-down of KQEC–TV was, in fact, temporary; that new equipment was, in fact, installed during the shut-down; and that the licensee kept the Commission regularly informed of its progress towards installation of the new equipment." *KQED II*, 88 FCC2d at 1162, JA 9. Consequently, the Commission found that appellants' asser-

tions of misrepresentation did not raise a substantial and material question of fact. *See id.*

3. *Review of the FCC decision.* With all due deference to the Commission, its findings here do not adequately respond to the allegations made by appellants. The parties do not dispute that the deactivation was temporary, that new equipment was installed during the deactivation, and that KQED regularly informed the FCC of the progress of the installation. This common ground, however, does not mean that no factual dispute exists. The thrust of appellants' allegation is that, regardless of what eventually happened, the initial deactivation was decided upon for reasons other than those concerned with the equipment installation—technical *or* budgetary. KQED, on the other hand, explains (after-the-fact) that although the deactivation was, in fact, budgetary (a fact which appeared in no form in its communications to the FCC),[4] it resulted from the specific budgetary problems that would have been caused by operating during the equipment installation and not from KQED's ongoing budgetary problems. The Commission attempts to explain away this difference by noting that "KQED does not deny that it was budgetary reasons that led it temporarily to suspend operations at KQEC pending the equipment repair." Brief for appellee at 16. This is simply not the point. The difference is over the particular type of budgetary constraints that caused the deactivation. And it is clear that the two versions conflict: Appellants assert that the budgetary discussions about the deactivation of KQEC–TV contained no mention whatever that cost savings referred to the additional costs created by the equipment installation; KQED asserts that those additional costs were, in fact, what caused the budget-saving deactivation.[5] Appellants

---

4. We express no opinion on the FCC's conclusion that, assuming that the extraordinary expenditures *were* KQED's reasons for darkening KQEC–TV, KQED's letters to the FCC constituted no misrepresentation.

5. It is interesting to note that these extraordinary costs of $1,000 per week comprised a very small percentage of KQED's 1979–1980 total budget of some $14 million. It is also interesting to note appellants' allegation that with the money that KQED saved by not operating KQEC–TV during the month of November 1979,

contend that the deactivation was originally planned to extend until the end of the 1979–1980 fiscal year—a fact that indicates the connection with general budgetary concerns; KQED asserts that, as it told FCC, it planned all along to reactivate KQEC–TV when the equipment installation was completed.

Having observed the existence of this conflict, we must decide whether the FCC could reasonably have decided that a hearing was not required under the statute. That is, we must determine whether the statutory tests noted above have been met.

■ The FCC contends that any dispute here is not over facts, *see* brief for appellee at 17 ("the facts are largely undisputed"), but over inferences. This contention is without merit. First, although most of the underlying facts of the case are not in dispute, the specific facts relating to KQED's reasons for darkening KQEC–TV are. Further, although the question of KQED's intent here might be termed an inference, we cannot accept such an interpretation—the result of which would be to insulate all FCC decisions denying hearings on misrepresentation issues such as intent from any judicial review. Questions of intent are factual and we will treat them as such. *See Pullman–Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982) ("Treating issues of intent as factual matters for the trier of fact is commonplace."); *see also U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983). It is true, especially in a situation such as this where the factual question at issue is the intent of a party, that proof of the disputed fact may turn on inferences to be drawn from other facts. For example, non-inferential or non-circum-

stantial evidence of intent can be given only by one party—the party whose intent is in question. But to bar a party who alleges telling and pertinent subsidiary facts from judicial review on the ground that Commission decisions as to inferences are dispositive can simply not be countenanced in this context. Allegations that KQED management stated different reasons to its board of directors and to its members than to the FCC do present a factual dispute, even though the dispute is over KQED's *actual* intent—an intent which must be inferred from the subsidiary fact of its statements to third parties. This conclusion is supported by our decision in *Citizens Committee to Save WEFM v. FCC,* 506 F.2d 246, 266 (D.C.Cir.1974) (*en banc*), in which we held that an evidentiary hearing was required where the only conflicting facts going to a similar misrepresentation issue centered around statements made to third parties. *See also Citizens Committee to Preserve Voice of Arts in Atlanta v. FCC,* 436 F.2d 263 (D.C.Cir. 1970).[6]

■ FCC also contends that the misrepresentations at issue here, even if assumed, cannot mandate a hearing because an intent to deceive via the misrepresentations was not adequately alleged and supported by appellants. This contention cannot support the otherwise unreasoned decision in this case. As this court has noted in a similar case, it is fundamentally unfair for FCC to dismiss a challenge where the challenging party has seriously questioned the validity of a representation and the defending party is the party with access to the relevant information. *See Citizens Committee to Save WEFM v. FCC, supra,* 506 F.2d at 265–266. In a case such as this, a

---

at a saving rate of $5,000 per week out of *budgeted* funds, it could have operated KQEC–TV *with* the "extraordinary" additional expenditure of $1,000 per week for five months and still not have gone over budget. *See Response to KQED's Opposition to Petition for Reconsideration,* July 6, 1980, at 3, *reproduced in* JA at 334.

**6.** This situation, in which the intent of the licensee has been placed squarely in issue by the

affidavits and documents submitted by appellants, is to be distinguished from the situation in *Washington Ass'n for Television & Children v. FCC,* 665 F.2d 1264, 1269–1270 (D.C.Cir.1981). There, the parties requesting a hearing alleged misrepresentational intent but neglected to support that allegation with a statutorily adequate showing. In that case, therefore, no facts were properly placed in issue.

party must be assumed to have knowledge of conflicting statements it has made (unless it shows otherwise), and thus knowledge of falsity. And, as this court has found, "[T]he fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity would be enough to justify a conclusion that there was fraudulent intent." *Leflore Broadcasting Co. v. FCC*, 636 F.2d 454, 462 (D.C.Cir.1980).

■ The Commission also intimates that the evidence offered by appellants in support of their allegations is somehow deficient. Although appellants may have exaggerated the depth of their support by referring to the charges as "exhaustively documented," we think that the charge they articulate and the documentation they proffer are entirely adequate under the statute. Thus appellants have raised a vigorous factual dispute regarding the issue of misrepresentation. FCC concedes that such a dispute is substantial and material. This conclusion appears abundantly supported by previous FCC decisions and by existing case law. *See, e.g., Citizens Committee to Save WEFM v. FCC, supra* (mandating hearing where adequate allegations of misrepresentation made).

In conclusion, FCC's decision denying a hearing on this issue was not reasoned and was arbitrary and capricious. The Commission here ignored statutorily adequate allegations going to a substantial and material factual dispute and in effect obviated the need for a hearing by finding itself that one factual version was the true and correct one. Yet the determination of which factual version is indeed accurate is precisely the function of an evidentiary hearing. In this case such a hearing should have been ordered. On this ground, therefore, we reverse the FCC's denial of a hearing and remand for the hearing that is required by statute.

### B. *Claim of Excessive Commercialization by KQED*

Appellants also claim that KQED's activities have become excessively commercial-ized and that this emphasis on income-producing activities has interfered with production of local programming and other programming for which KQED is, as a public television station, responsible. The Commission's response to this allegation appears to have been simply that even if such allegations are true they would not constitute material and substantial factual disputes. Specifically, FCC notes that unless bad-faith (as opposed to merely incompetent) business judgment or inadequate programming is alleged, commercialization does not implicate, prima facie, the public interest. *See KQED II*, 88 FCC2d at 1163–1164, JA 10–11.

■ As noted previously, it is the Commission's province, in the first instance, to make a determination of whether a particular factual allegation is material or substantial. *See Nat'l Ass'n for Better Broadcasting v. FCC, supra*, 591 F.2d at 815. Whether or not this court agrees that a particular determination is the best one, if that determination is not unreasonable it is our duty to affirm it. Here, the determination that commercialization *per se* or even commercialization that to some extent infringes upon local public interest programming is not in violation of the public interest is reasonable. This determination affirms the generous discretion normally given by the FCC to local public stations to conduct their programming affairs as they see fit, as long as they do not violate certain minimum standards of conduct. *See, e.g., Columbus Broadcasting Coalition v. FCC, supra*, 505 F.2d at 326 ("The licensee is accorded considerable discretion in programming choice, so long as it meets the needs of the community. * * * Petitioners to deny * * * must plead facts with specificity which will show that an existing licensee's programming has not met the needs of the community." (citations omitted)). And it extends this discretion to financial decisions as well.

■ Although this policy insulates public licensees from having their licenses denied if they make some bad business deci-

sions that affect programming, it does require the absence of bad faith and it does limit how many bad decisions a station can make: If inadequate programming is the result, then the station's programs can be attacked. In sum, it is our conclusion that FCC's determination that appellants' allegations of excessive and intrusive commercialization did not pose a material and substantial factual question was reasonable and should be affirmed.

C. *Claim of KQED Noncompliance With the "Open Meeting" Provisions of the Public Broadcasting Act*

Appellants' final claim is that the Commission acted unreasonably in not calling for a hearing based on their allegations that KQED had impermissibly failed to comply with the open meeting and financial disclosure requirements contained in the Public Broadcasting Act of 1967. *See* 47 U.S.C. § 396(k)(4) and (5) (1982). This Act set up the Corporation for Public Broadcasting, provided for the Corporation's funding of programs and public stations, and then specified certain conditions that were to attach to that funding. *See generally* 47 U.S.C. § 390 *et seq.* (These conditions included the open meeting and financial disclosure requirements.) Appellants argue that, although the statute provides only that these conditions are to attach to funding by the Corporation, the Commission erred in not considering the station's compliance or noncompliance with them in its determination that the license renewal was in the public interest. FCC responds that it is in no way required to assume any jurisdiction over enforcement of these conditions, even in the guise of a factor to be considered in a license renewal determination.

This position is supported, as FCC argues, by the recent Supreme Court case of *Community Television of Southern California v. Gottfried*, 459 U.S. 498, 103 S.Ct. 885, 74 L.Ed.2d 705 (1983). In that case the Supreme Court held that the Commission could, within its discretion, refuse to consider a public television station's compli-

ance with the provisions of the Rehabilitation Act in its determination of whether renewal of the station's license was in the public interest. Although appellants attempt to distinguish *Gottfried* by noting that, in that case, the Supreme Court expressed concern with the fact that the requirement of considering compliance with the Rehabilitation Act had been placed by the Court of Appeals on the public station only (and not on similarly situated private stations), we think that *Gottfried* governs this case. For, in *Gottfried*, the Court relied on the fact that Congress' intent with respect to the Rehabilitation Act was not to "impose any new enforcement obligation on the Federal Communications Commission." *Id.* at 509, 103 S.Ct. at 892. It stated further that "[i]t is clear that the Commission is not a funding agency and has never been thought to have responsibility for enforcing [the Rehabilitation Act section at issue]. Furthermore, there is not a word in the legislative history of the Act suggesting that it was intended to alter the Commission's standard for reviewing the programming decisions of public television licensees." *Id.* at 509–510, 103 S.Ct. 892–893 (footnote omitted).

 These considerations apply equally to the suggestion that the Commission incorporate the Public Broadcasting Act requirements into its licensing proceedings. That Act did not expressly provide for any such activity by FCC. Indeed, one provision of the Act specifically states that nothing in the Act "shall be deemed * * * to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors * * *." 47 U.S.C. § 398(a). And, as this court noted in *Accuracy in Media, Inc. v. FCC*, 521 F.2d 288, 295–296 (D.C. Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976), the legislative history of the Public Broadcasting Act does not indicate that it was intended to alter a licensee's preexisting statutory duties. Consequently, we uphold FCC's decision that it is not required by statute to

consider allegations of violations of the Public Broadcasting Act's provisions in its public interest determinations.

▮▮▮ Appellants contend that this conclusion is somehow undermined by the fact that in this case the Corporation specifically declined to enforce the provisions in question. The implication is that in this situation, if not generally, it becomes FCC's duty to act as a backup enforcer. We do not think the Public Broadcasting Act mandates this result. Previous decisions of this court have denied that FCC has any responsibility for assuming the enforcement responsibilities of CPB or for supervising it in its enforcement actions. *See Accuracy in Media, Inc. v. FCC, supra; see also Network Project v. CPB,* 561 F.2d 963 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978). Although neither of these cases dealt specifically with the situation at issue here, both emphasize that supervision over the Corporation was intended by Congress to remain an exclusively congressional responsibility. We hold, therefore, that the Commission has no duty to enforce the funding conditions of Section 396(k)(4) & (5).

▮▮▮ Having upheld the FCC contention that it was not required by statute to consider these factors in its licensing proceedings, we turn to the question whether the Commission acted unreasonably in deciding that such issues would not raise material and substantial factual questions. We think that the Commission did not act unreasonably in determining that compliance with the open meetings requirement of the Act was not material to its public interest determination: It was within the Commission's discretion to decide that compliance

with the Public Broadcasting Act is better served by the funding constraints to be enforced by the Corporation rather than by injection of those considerations into licensing renewal determinations. Thus we affirm the agency's finding that the allegations of violations of the "open meeting" provisions did not mandate a hearing under Section 309.

### IV. FCC Motion to Strike Intervenor KQED's Brief

The final issue in the case concerns the disposition of the claims raised by intervenor KQED. KQED, on March 19, 1982 and November 18, 1983, filed notices of intervention pursuant to 47 U.S.C. § 402(e)[7] in these consolidated cases on the ground that it was an interested party because it would be "aggrieved by reversal or modification of the FCC's order." Notice of Intention to Intervene, March 19, 1982.[8] Thus it filed its brief after the appellee Commission as would an intervenor in support of the Commission. In its brief, however, instead of presenting arguments in favor of upholding the Commission's decision regarding the license renewal, it argued that FCC had failed to comply with its statutory mandate by considering appellants' petitions in a substantive manner at all. According to KQED, a more summary dismissal of these "patently deficient" petitions was required. Thus, although KQED requested that this court affirm the license renewals granted here, it requested also that the court require the Commission to institute a procedure for screening out petitions which are as facially "captious and purely obstructive" as they contend the complaints filed by appellants in this case are.

---

7. This provision states:
 Within thirty days after the filing of any such appeal any interested person may intervene and participate in the proceedings had upon said appeal by filing with the court a notice of intention to intervene and a verified statement showing the nature of the interest of such party, together with proof of service of true copies of said notice and statement, both upon appellant and upon the Commission. Any person who would be aggrieved or whose interest would be adversely affected by a reversal or modification of the order of the Commission complained of shall be considered an interested party.

8. KQED's language in its November 18, 1983 Notice of Intention to Intervene was slightly more ambiguous. There it noted that it would be "aggrieved by reversal or by certain modifications of the Commission's order."

The Commission, though not responding to these allegations in its main brief, filed a motion to strike KQED's brief on the grounds that, first, it had no opportunity to respond since KQED filed its brief *after* the FCC (to the schedule of an intervenor in support of the FCC), and, second, because the claims raised by KQED were without merit in any case.

 We need not reach the question of the merits of KQED's claims because we find that FCC prevails on its first point. The claims made here by KQED were only tenuously related to its noticed position that it was intervening in support of the FCC decision. Although we do not speculate on how specific notice must be,[9] we hold that the notice given to the Commission in this case was inadequate. The sole claim KQED argued here was totally in opposition to the FCC position taken in the order at issue. Thus the KQED notice of intervention was inadequate to allow these arguments to be fairly introduced. The Commission's motion to strike KQED's brief here is therefore granted.[10]

### V. CONCLUSION

The Commission's decisions *KQED I, KQED II,* and *KQED III* are affirmed in all respects except that its decision to deny a hearing on the claim that KQED misrepresented the events surrounding the December 1979 darkening of KQED–TV is reversed. These cases are remanded for proceedings consistent with this opinion.

*So ordered.*

**9.** The statute requires merely a "verified statement showing the nature of the [intervening party's] interest." 47 U.S.C. § 402(e). We think a general statement that the intervenor supports or opposes an agency order will normally be adequate. Where, as here, however, an intervenor supports most of an order but briefs only its point of disagreement, such generality is insufficient.

**10.** We differ in our reasoning here from the recent Seventh Circuit case of *Illinois Bell Telephone Co. v. FCC,* 740 F.2d 465 (7th Cir.1984), which disallowed an intervenor's brief on the ground that the intervenor should have cross-

MacKINNON, Senior Circuit Judge (concurring in part & dissenting in part).

In my opinion the majority's standard is so lax as to when the Federal Communications Commission must require a hearing under § 309 of the Communications Act that it amounts to no standard at all. The Committee to Save KQED offers what may charitably be called an implausible interpretation of undisputed facts. Fancying themselves the guardians of the public interest, the appellants have done nothing more than vent their suspicions that behind KQED's decision to replace faulty equipment lurked a desire to circumvent the Commission's instructions. But this suspicion does not raise any question of material fact.

This becomes obvious when we examine just what the factual "dispute" is that the majority argues compels the FCC to hold a hearing. KQED took one of its public television stations off the air for a limited period. It did so, the station told the FCC, to replace a faulty master switcher. According to Mr. Kroll, members of the KQED board made various remarks, or failed to make remarks, in a way that might be interpreted to mean that this deactivation was entirely for budgetary reasons. (J.A. 269.) The appellants, hearing this, alleged before the FCC that the "darkening" of the station was not really to replace equipment, but in fact for "budgetary reasons." It might strike a businessman that decisions about when and how to replace equipment are not altogether unrelated to budgets, but the Committee to Save KQED was in fact alleging that

appealed if it wanted to oppose the Commission's order in any respect. This circuit has not required such procedural niceties and has allowed intervention where an appeal was also possible. *See New South Media Corp. v. FCC,* 644 F.2d 37 (D.C.Cir.1981) (*per curiam*). This is due generally to the statutory language regarding intervention, which requires merely that the intervenor would be aggrieved or adversely affected by reversal or modification. We are sympathetic, however, with the Seventh Circuit's substantive concern regarding notice and believe that our decision here meets that concern.

KQED was shutting down one of its stations out of a generalized intent to save money, rather than out of a specific intent to replace equipment in the cheapest way possible. As we shall see, this curious distinction is as puzzling as it first appears. KQED then protested that all its talk about budgets was not meant to say that it was shutting down one of its stations just because it could not in general afford to operate it, but because it could not afford to hire out substitute facilities to keep the station on the air while it was replacing its faulty equipment. (J.A. 322–23.) The FCC was satisfied that this explanation was truthful, found it to be adequate when it considered the petition for rehearing and therefore declined to hold an evidentiary hearing into the matter.

Now the majority rules that the Committee to Save KQED has raised a substantial and material question of fact that merits a hearing by claiming KQED's *real* intent was not to replace equipment but in general just to save money. The question of fact to be addressed at this hearing must indeed be that of intent, in its purest metaphysical sense, for no more concrete question of fact remains to be settled. It is, for example, undisputed that the equipment in question was in fact faulty and needed to be replaced, that extraordinary measures would indeed have been necessary for KQED to keep the station on the air while the new equipment was installed, that these measures would have cost a station already in great financial duress at least $1000 per week beyond normal, *budgeted* operating expenses (J.A. 321, 329–30), that KQED initially attempted to bear these extraordinary expenses (*id.*), that problems beyond KQED's control caused the delays in the equipment repair (J.A. 328–31), and that *once the equipment was repaired, the station did in fact go back on the air.* If KQED was in fact harboring some bad motive, it was not discernible in its actions. This leaves unsolved the mystery of where the Commission is supposed to look for the *real* reason KQED decided to replace its master switcher, once it moves, that is,

beyond the perhaps too obvious explanation that it was broken.

Nor is it clear what an evidentiary hearing could accomplish. For example, the appellants do not want to run the station themselves (Transcript of Oral Argument 10). Appellants state that they are merely asking for "a hearing before the FCC to determine whether in fact the station is keeping its obligations and observing its obligations as a licensee." *Id.* But it is obscure what legal obligation, as opposed to the moral obligation to be sincere, appellants allege KQED has violated in saving money by making a necessary technical repair.

We should respect the knowledge and expertise the Commission exercised in deciding whether KQED's explanation was truthful. But not doing so, the majority opinion founders on the problem that it is *always* possible to infer some bad motive from a set of actions and statements, even if there is a more plausible explanation available. This decision would seem to require the FCC to hold that the burden of raising a substantial and material question of fact can be satisfied merely by taking a dim view of actions that on their face appear perfectly legal and reasonably motivated. This statutory standard must have more to it than that. This unfortunate result, moreover, is unnecessary. *WEBR v. FCC*, 420 F.2d 158 (D.C.Cir.1969) may reasonably be taken to leave questions about misrepresentations of fact within the province of the Commission. And *Citizens Committee to Save WEFM v. FCC*, 506 F.2d 246 (D.C.Cir.1974) (en banc) certainly does not imply that it is enough to present allegations of bad intent merely consistent with undisputed facts in order to get a hearing. That case involved allegations of mismanagement that would be verifiable once WEFM's books were looked into, and, more analogously to this case, an allegation of misrepresentation that was buttressed by *evidence of contradictory statements of intent* by the licensee. There is no such evidence here. Here we have only the Committee's theories about what KQED officials' *real* motives were when they tem-

porarily darkened the station, and the station's entirely consistent claim that the budgetary reasons for redarkening after December 1979, when the station was activated for three weeks, was that keeping the station going during repairs was creating extraordinary, non-budgeted expenses.

The majority also seems to assert that it is unbelievable that KQED was required to darken a station because of equipment failure. The court may find it hard to believe that a public television station with a yearly budget of $14 million would worry about wasting a mere $1000 per week. *See Majority Opinion* at 15 n. 5. But this conviction is just a guess about the real stringencies under which public television operates compared to the FCC's informed judgment. It may be that KQED welcomed the opportunity that the broken master switcher afforded the station to save money by closing temporarily. It is, however, the laws of economics, not the law of the land, that decrees that public television stations should always lose money. If the master switcher's breaking actually saved KQED money, this is more an artifact of the peculiar economics of the public sector than it is evidence of misrepresentation. No one has alleged that it was wrong for KQED to take advantage of the darkening to save money. No one has alleged that it was under a legal obligation to go over budget to stay on the air. Indeed, at oral argument, the Commission made it clear that it assumed KQED viewed the equipment failure as a piece of good luck (Transcript of Oral Argument 23). No one has suggested KQED violated its obligations as a licensee in so doing. Because there is no dispute that the master switcher did in fact break, that it had to be replaced, and that operating out of rented quarters would have been extraordinarily expensive, there is no material question of fact left to be settled. All the Committee has in fact alleged is that KQED was glad to have a broken master switcher to replace. If there is an argument that otherwise legal acts, accompanied by bad intent, are illegal under the Communications Act, or otherwise present an issue the Commission should look into at

a hearing, it has not been presented to this court. And even such an argument would presuppose that intending to save money during the replacement of the switcher, as KQED did, was bad, a supposition that seems arguable at best. To raise any substantial question of *misrepresentation*, there must be more, I should hope, than a suspicion someone is not unburdening himself of every possible feeling, e.g. relief, that might be associated with an act. The Commission might well find it impossible to comply with the mandate of the majority's decision.

For the reasons stated above therefore I respectfully dissent from the majority's analysis and holding concerning the misrepresentation claim. In the remainder of the opinion, I concur.