**BEAUMONT BRANCH OF THE NAACP and the National Black Media Coalition, Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Pyle Communications, Inc., Intervenor.**

No. 87–1188.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 1, 1988.

Decided Aug. 19, 1988.

---

David Honig, for appellants.

David Silberman, Counsel, F.C.C., with whom Diane S. Killroy, Gen. Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, D.C., were on the briefs, for appellee.

Robert W. Healy, Washington, D.C., entered an appearance for intervenor, Pyle Communications of Beaumont, Inc.

Before MIKVA, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

The petitioners, the National Black Media Coalition, Inc. and the Beaumont Branch of the NAACP (collectively "NBMC"), have brought this action to challenge a decision of the Federal Communications Commission ("FCC" or "Commission") to renew the broadcast license of

Pyle Communications of Beaumont, Inc. ("Pyle") for two Beaumont, Texas radio stations. In granting the license renewal, the Commission rejected a petition to deny the renewal filed by the NBMC, which charged that Pyle had discriminated against its black employees and had failed to meet its affirmative action obligations.

The FCC found that the petitioners' allegations of race discrimination were without merit and declined to hold a hearing on those charges, because it found that no significant factual issues remained in dispute. It also held that although Pyle had been deficient in meeting the FCC's affirmative action requirements, those deficiencies did not require a hearing. Instead, the Commission granted Pyle a short-term license renewal and ordered it to file two particularized equal employment opportunity ("EEO") reports. *Pyle Communications of Beaumont, Inc.*, 2 FCC Rcd 1793 (1987).

We hold that the Commission's decision was not consistent with the requirement of the Communications Act of 1934 that the Commission hold a hearing when "a substantial and material question of fact is presented" to it. 47 U.S.C. § 309(e). The record contains several important questions that we do not believe have been adequately answered by the FCC's inquiry to date, namely: (1) why black employment at the stations dropped so dramatically after Pyle acquired the stations, and why blacks were so underrepresented in subsequent hiring by the stations; (2) why the licensee contradicted itself in its statements to the FCC of the reasons for the departures of several black employees who left after the acquisition; and (3) why the stations were unable to maintain an adequate affirmative action program during these years as required by FCC regulations.

The record evidence in these three areas raises troubling questions that remain unresolved about whether the licensee practiced intentional employment discrimination. The Commission acted unreasonably when it pronounced itself satisfied on these points based entirely on the licensee's sketchy and sometimes contradictory expla-

nations. Accordingly, we remand the case to the Commission and direct it to hold a hearing to resolve these material factual disputes.

## I. Background

On February 15, 1981, Pyle acquired two radio stations in Beaumont, Texas, KIEZ–AM and KWIC–FM ("the stations"). About six weeks after acquiring the stations, Pyle changed the format of the AM station from black-format to news-talk. The FM station's format remained unchanged. On March 31, 1983, Pyle filed for a renewal of the stations' licenses with the FCC. Shortly thereafter, the NBMC filed a petition to deny the renewal applications, *see* 47 U.S.C. § 309(d)(1), charging that the stations had systematically terminated their black employees and that they had failed to meet their equal employment opportunity obligations.

FCC employment report forms filed by the stations indicate that black employment fell sharply between 1981 and 1983, both overall and, more dramatically, in the top job categories. The reports indicate that overall black employment at the stations fell from eleven employees who comprised 33.3 percent of the stations' work force in 1981 to four employees who represented 8.8 percent of the work force in 1982 and one black employee who constituted 5.6 percent of the work force in 1983. The decline was even more pronounced in the top four job categories on the FCC compliance form—full-time management, professional, technical, and sales positions. Black employment in these jobs declined from four employees who held 23.5 percent of such jobs in 1981 to one who held 3.3 percent of such jobs in 1982 to zero employees in 1983. During this time, the stations hired 112 new employees. Of these, only three were black (2.7 percent), and none of them remained with the station longer than two months.

In addition to noting the decline in black employment, the petition contended that the radio stations had failed to meet their EEO obligations. *See* 47 C.F.R. § 72.2080 ("Each station shall establish, maintain,

and carry out, a positive continuing program of specific practices designed to assure equal opportunity in every aspect of station employment policy and practice."). The petitioners contended that the stations used no minority recruitment sources to recruit minorities in a systematic fashion. The petitioners also alleged that the stations had not filled out their EEO forms properly. For example, the EEO form that the stations filed with the FCC omitted the self-examination section and information about new hires, and listed no sources of minority referrals.

On June 24, 1984, Pyle delivered an Opposition to appellants' petition to deny the license. As part of this Opposition, Charles W. Pyle, the president of Pyle Communications, filed an affidavit in support of the renewal application in which he denied that he or the stations had engaged in discriminatory hiring practices. He stated that because of the departure of the stations' general manager, he could not determine how many minority organizations had been contacted or how many advertisements had been placed in media of particular interest to minorities. He stated that he had left those questions blank on the EEO forms because of lack of direct knowledge. The section on new hires was left blank "inadvertently," he said, and he provided the missing data.

On July 6, 1984, the FCC sent Pyle its first letter of inquiry. In it, the Commission inquired why Pyle had been able to specify some recruitment sources contacted, but had been unable to specify what minority recruitment sources it had contacted. In addition, it asked why Pyle had not completed the self-examination portion of the EEO application. In the same letter, the FCC asked Pyle to supply a list of all full-time employees included in the 1983 and 1984 reports, indicating race and job category, and a list of all job vacancies, indicating job title, race, and referral source of all applicants and of the person ultimately hired. Pyle sent a letter of August 20, 1984 replying to some of these questions. It included a list of persons hired from January 1, 1983 to March 15, 1984, including race, sex, and referral

source. Pyle also stated that during this time offers of employment were made to three black males, all of whom declined. Pyle stated, however, that it was unable to reconstruct the race of job applicants who had not taken jobs because the forms it used did not include a question about race.

On October 30, 1984, the Commission sent a second letter that stated that its "[r]eview of the information submitted leads us to conclude that it is insufficiently responsive to the questions in our inquiry of July 6, 1984, and that, in some instances, it raises additional questions." The FCC requested from Pyle more specific information about its hiring and its EEO policies. It again sought a list of all job applicants between February 15, 1981 and August 1, 1983 and their referral sources. It also requested details of efforts to recruit minorities; a list of all terminations during this period, including date and reason for termination; a narrative discussion of effectiveness of the stations' EEO program during the license term; and an explanation of why virtually no blacks were hired from the time Pyle purchased the station until October 5, 1983.

Pyle responded to the Commission's new questions in a letter of November 16, 1984. It provided a list of all persons hired or previously on staff during the time period asked about by the FCC. Pyle stated, however, that it did not have any information about the role of departed employees. It also continued to maintain that it had no information about applicants who were not hired. It responded in brief terms to the question about why particular black employees had left, stating for example that some employees either had been terminated for unsatisfactory performance or had moved away.

The NBMC submitted comments to the FCC on Pyle's November 16 letter. It criticized Pyle's reply on several scores. First, it contended that the employee lists provided by Pyle were unhelpful because they contained only last names and first initials with no addresses or telephone numbers, making it extremely difficult to track down terminated employees and obtain their ac-

counts of their terminations. Second, the NBMC stated that Pyle's responses were suspect because they failed to include any affidavits or other materials supporting the licensee's claims. The NBMC maintained that it was "inconceivable" that stations of this size would not keep records of applications for employment. Third, the NBMC took exception to Pyle's failure to provide greater information about the reasons for the departure of the ten black employees. The NBMC argued that the "cryptic comments" provided by Pyle did not adequately explain its reasons for firing those employees. The NBMC gave several specific examples of explanations that it considered unacceptably vague. It noted that one employee, B.J. Boutner, was listed as having been terminated because she "moved to home in Missouri." The NBMC pointed out that Pyle failed to explain whether Boutner left because she was terminated, or was terminated because she was planning to leave. It also questioned the circumstances of the termination of D. Price, another employee, whose reason for termination was given as that he was "not needed for part-time work only." The NBMC noted that nine whites were hired in the month before and the two months after D. Price was terminated on March 31, 1981. Of those hired soon after D. Price's termination, two—named DuBose and Beason— were hired for part-time work, raising the question of whether it was true that D. Price was not needed for part-time work. Finally, the NBMC contended that within one year of acquiring the stations, Pyle had released all of the black employees who had originally been there, and that of the 38 announcer positions filled during the time period covered by the manifests, only two were filled by blacks, and each of those lasted only two months. The NBMC maintained that Pyle had still not adequately explained its employment record.

On February 12, after the NBMC comments had been filed, the Commission sent Pyle a third letter. In it, the Commission made three general inquiries. First, it requested more information on the particular circumstances of the termination of a number of the stations' black employees, including Boutner and Price. Second, it asked Pyle to explain how it had complied with the Commissions' EEO regulations, since it apparently had no EEO program. Finally, it asked Pyle to explain how, having acquired a station with a predominantly black staff in a labor market with a 21.7 percent black work force, and having had 110 hiring opportunities since the acquisition, Pyle had such a small number of black employees by the end of the license term.

Pyle responded to the FCC's February 12 letter with a letter of April 12, 1985. Pyle stated that the black employees who left the station either resigned or were discharged because they were unfamiliar with the new radio formats, unwilling to work full-time, or uninterested in remaining with the station after the format changes. Pyle provided additional information about some of the terminations cited by the NBMC. It stated, for example, that employee Boutner, who it had said was terminated because she had moved home to Missouri, moved home because she had been terminated "because of unprofessional behavior." It also changed its account of employee D. Price's termination, stating that he left not because he was not needed for part-time work, but because he decided he did not want to work under the new format. Pyle's response to the FCC stated that "I can see how the 'numbers' may appear to someone unfamiliar with the particular situations, but the reality is that most of the Blacks who left represent people in other careers who were participating in radio on the side." Pyle explained its EEO compliance by stating that the station was operating at a loss during the first year, that it lacked a general manager during another period, and that generally "during the period in question the principal task at the stations was to keep them financially alive." Pyle again stated that it did not have employment records for this time period and had to rely on payroll records and the memories of present employees to discuss its EEO activities. But it did state that it placed job notices on the bulletin board at Lamar University, which it stated has a substantial minority enroll-

ment. In addition, Pyle submitted an affidavit of Gerald P. Loeb, a black former part-time announcer with KIEZ, who stated that he had observed no discrimination at the station.

The NBMC in turn filed comments on Pyle's April 12 letter. In a letter of June 4, 1985, it stated that although it did not have the resources to conduct a full-scale investigation of Pyle's claims, it would nevertheless give its general views on Pyle's explanations. The NBMC's critique had two main themes. First, it contended that Pyle's account of the departure of the stations' black employees was not credible. It noted that Pyle's story changed during the course of the Commission's inquiry. It gave as an example Pyle's statement in its original filings that employee D. Price, a sportscaster, left the station because he was not needed for part-time weekend work, which contrasted with its subsequent statement in its April 12 letter that Price left by mutual consent because he was not interested in doing sportscasting under the new format. The NBMC also challenged other instances in which Pyle stated that blacks had left the station voluntarily. It maintained that in the tight radio employment market voluntary departures are relatively unusual and that the Commission should compel Pyle to provide some evidence that the departures were in fact voluntary. Similarly, it contended that Pyle should be required to produce some documentation to support its allegations of "unprofessional behavior" on the part of those black employees dismissed for cause. The second broad theme of the NBMC's critique was its contention that Pyle still had not explained how it had complied with EEO guidelines or why it had so few blacks in a labor force that was 21.7 percent black. It maintained that most of Pyle's referrals were from word-of-mouth and that there was not sufficient basis for concluding that Pyle had complied with EEO rules and had not discriminated. It urged the Commission to hold a hearing to consider these issues before acting on the license renewal application.

After this review, the Commission awarded Pyle a short-term license renewal.

It found that the record did not warrant a finding that Pyle had discriminated against black employees. It also found that although Pyle's efforts to meet its EEO obligations were inadequate, its failings were due to inadvertence and did not warrant a hearing. The Commission stated that its inquiries, including three opportunities for the petitioners to comment on Pyle's submissions and develop evidence of discrimination, provided sufficient information for its determinations. It concluded that because no substantial and material question of fact remained to be resolved, an evidentiary hearing was unnecessary. But because of the EEO lapses, the Commission issued only a short-term license renewal and ordered Pyle to file two particularized EEO progress reports, including a description of its efforts to recruit black applicants for job openings.

## II. Discussion

### A. Statutory Requirements and Standard of Review

■ The Communications Act of 1934 directs the FCC to renew broadcast licenses only when it finds that such renewal would serve "the public interest, convenience, and necessity." 47 U.S.C. § 309(a). It also establishes a mechanism whereby any interested party may file a petition with the FCC urging it to deny a license application. See id. § 309(d)(1). The Commission may then either schedule a hearing on the petition or not. It may act without a hearing, however, only when it has determined that "there are no substantial and material questions of fact and that a grant of the application would be consistent" with the statute's public interest provision. Id. § 309(d)(2).

■ FCC regulations promulgated pursuant to the statute's public interest provision state that the public interest requirement contains both anti-discrimination and affirmative action components. The anti-discrimination principle dictates that a license renewal will not be deemed to be in the public interest if a licensee has engaged in intentional employment discrimination.

*See Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC,* 595 F.2d 621, 628 (D.C.Cir.1978) (en banc). In addition, the Commission has promulgated regulations requiring stations to establish and carry out a positive program to ensure equal employment opportunity. *See id.* at 628–29; *National Black Media Coalition v. FCC,* 775 F.2d 342, 344–45 (D.C.Cir.1985).

As this court has noted previously, the FCC has taken different approaches to enforce its anti-discrimination and affirmative action requirements. The Commission has enforced its affirmative action requirements primarily through prospective remedies. Unlike the Equal Employment Opportunities Commission, which has a broad mandate to address the effects of past discrimination through a variety of retrospective, make-whole remedies for aggrieved persons, the FCC's affirmative action enforcement has been "concerned primarily with the future." *Bilingual,* 595 F.2d at 628. To that end, it has generally invoked prospective remedies of the sort it used in the instant case against Pyle—short-term license renewals and renewals conditioned on reports on EEO progress. We have noted previously that because its affirmative action policy is prospective, the Commission rarely holds hearings on renewal applications solely for the purpose of investigating a licensee's affirmative action performance. *Id.* The Commission's enforcement of its non-discrimination requirements is different. A documented pattern of intentional discrimination will almost invariably disqualify a broadcaster from obtaining or retaining a license. *Id.* at 629. When a responsible and well-pleaded claim of discrimination has been made, we have held that the FCC may be required to hold a hearing in advance to consider the charges and to determine whether to grant the license at all. *Id.*

■ We have also previously held that a petition to deny must fulfill three conditions before the Commission will be required to hold a hearing. *See California Public Broadcasting Forum v. FCC,* 752 F.2d 670, 674 (D.C.Cir.1985) (*"CPBF"*). First, the petition must show the necessary specificity and support; mere conclusory allegations are not sufficient. *See id.; Stone v. FCC,* 466 F.2d 316, 322 (D.C.Cir. 1972). Second, the dispute must be a *factual* one, rather than a disagreement over the proper interpretation to be given to agreed upon facts. *See CPBF,* 752 F.2d at 674. Finally, even if the facts are in dispute, a hearing is required only if the issue is material and substantial. *See id.* The existence of these factors is judged not merely based on the allegations of the petition, but also taking into account all the evidence before the Commission, including affidavits filed by the licensee. *See Citizens for Jazz on WRVR, Inc. v. FCC,* 775 F.2d 392, 395 (D.C.Cir.1985).

■ The Commission has broad discretion in determining whether to hold a hearing in conjunction with a license renewal. A reviewing court will not interfere with an agency's decision not to hold a hearing if it is reasonable and supported by the evidence before it. Naturally, however, the Commission's discretion in this area is not absolute. We have noted previously that we will not "hesitate to intervene where the agency decision appears unreasonable or bears inadequate relation to the facts on which it is purportedly based." *CPBF,* 752 F.2d at 675.

B. *Analysis of the Commission's Decision to Act Without Holding a Hearing*

■ The record before the Commission contains considerable evidence that raises questions as to whether the licensee engaged in intentional racial discrimination in employment. These questions fall primarily into three areas: (1) the substantial underrepresentation of blacks at the stations and the inadequacy of the licensee's explanations for it; (2) the inconsistencies or misstatements contained in the licensee's communications with the Commission; and (3) the licensee's deficient EEO record. In addition, the record indicates that these factual disputes turn on evidence to which only the defending party has access, a consideration that we have previously held to be relevant in evaluating the reasonable-

ness of the Commission's actions. After examining the evidence before the Commission, we find that substantial and material questions of fact in these areas remain unresolved.

First, the licensee's own submissions contain statistical evidence that raises troubling questions about its employment practices. During the licensee's brief tenure at the stations, black employment fell from 33.3 percent to 5.6 percent, in a labor market with a 21.7 percent black available work force. This decline was the product of two simultaneous trends: (1) the departure of ten of the eleven blacks who were employed at the station when it was acquired; and (2) hiring by the station in which only three of 112 new employees were black. We have held previously that "evidence of *substantial* statistical disparity [between available minority workforce and a station's minority employment] . . . while it may not in itself necessarily require resolution at a hearing, should at least put the FCC on notice that more information is required before the license renewal application can be granted." *Bilingual,* 595 F.2d at 629–30 (emphasis in original). The Commission in this case did not obtain the necessary information to determine that the very substantial discrepancy between black employment at the station and the number of blacks in the workforce was of benign origin.

The explanations given by the licensee for the statistical disparity do not resolve the questions raised by the petitioners. The licensee's explanations for the departure of the ten blacks employed at the time of the acquisition were clearly deficient. They were terse, in some cases only several words, and did not contain a sufficient basis for determining whether discrimination was a factor. In several cases, the licensee explicitly contradicted itself about the reasons for the termination of particular employees without offering any explanation for the contradiction. The Commission had an obligation to be more vigilant in investigating the circumstances of these departures. With only one exception, the licensee presented no affidavits from the departed employees to corroborate its accounts. Nor did it provide the Commission or the petitioners with the full names and addresses of the departed employees. The Commission approved the license renewal without requiring the licensee to submit even this most basic information. In doing so, it tolerated a situation in which only the party that was accused of practicing intentional discrimination had access to the alleged victims. In short, the Commission did not conduct its inquiry in a reasonable way.

The licensee's explanation for the second pattern that contributed to the underrepresentation of blacks at the stations—its hiring of only three blacks in 112 post-acquisition hires—also fails to put to rest questions about possible intentional discrimination. The licensee's chief explanations for its failure to hire more blacks were (1) that most blacks in the area were not qualified for jobs in the radio industry, and (2) that because of its precarious financial position Pyle was not able to outbid its competitors for those few skilled minorities. Nowhere in the record is either assertion corroborated, and the Commission appears to have made no independent attempt to do so. Nor does the record indicate that Pyle made the kind of outreach efforts that would be necessary to determine that few blacks in the area had the skills the station sought. Little would remain of the antidiscrimination requirement if all a licensee had to do to survive charges of discrimination was to make bald assertions of this kind. Perhaps most tellingly, if these factors were the only reasons for the licensee's poor record of hiring blacks, the record should reveal that blacks were hired in greater numbers for less-skilled clerical jobs. There does not, however, appear to be any evidence of this kind in the record. The Commission was remiss in accepting the licensee's conclusory explanations without further inquiry.

A second consideration to which the Commission paid insufficient attention is the pattern of inconsistencies and misstatements that marked the licensee's communications during the inquiry. For example, in the case of employee B.J. Boutner, Pyle

stated originally that her "reason for termination" was "moved home to Missouri." In February, after pointed questioning, Pyle changed the explanation to a statement that she was "terminated because of unprofessional behavior." Similarly, Pyle originally stated that sportscaster D. Price left because he was not needed for part-time work only, but eventually changed its position to state that Price left by mutual consent because he did not want to continue working under the new format. Pyle offered no explanation for the change in accounts and no affidavits to support its new characterization of the reasons for the employees' departure. A misstatement to the Commission in the course of a license-renewal investigation is a weighty matter. We have warned previously that "a party must be assumed to have knowledge of conflicting statements it has made (unless it shows otherwise), and thus knowledge of falsity." *CPBF*, 752 F.2d at 679–80. This is particularly true where, as here, the misstatements appear to have been self-serving: in each case, the licensee's initial assertion was that the black employee left voluntarily, and only later did it reveal that the departure was less than voluntary. The Commission erred in not demanding a satisfactory explanation for these convenient inconsistencies by the licensee.

Third, the Commission failed to give proper weight to the licensee's clearly deficient EEO record. The Commission had no trouble on the record before it in concluding that the licensee had failed in its obligation to establish and carry out "a positive continuing program of specific practices designed to assure equal opportunity in every aspect of station employment policy and practice." 47 C.F.R. § 73.2080. It found that Pyle's biggest failure in this regard was in not apprising sources of black applicant referrals about job openings at the station. In addition, the evidence before the Commission showed that Pyle handed in incomplete EEO forms and that it entirely failed to keep track of job applicants. The Commission determined, however, that although these failures existed, they did not warrant a hearing because they could be addressed prospectively.

If the licensee's only deficiency were its failure to implement an EEO program, the Commission's decision not to hold a hearing might be a reasonable one. *See Bilingual*, 595 F.2d at 628. But the Commission failed to accord proper weight to the added questions raised by the *combination* of a deficient EEO program and other evidence of discrimination. This court held in *Bilingual* that "a substantial statistical disparity, *especially when coupled with a languishing affirmative action plan*, raises questions as to whether the station's poor EEO performance owes to inadvertence, or to intentional discrimination." *Id.* at 630 (emphasis added). In a case like the instant one, where the absence of an EEO program coincides with a large statistical disparity and the unconvincingly explained departure of all but one of a station's black employees, the Commission erred in not according added weight to the fact that these events occurred simultaneously.

Finally, this court has noted in the past that "it is fundamentally unfair for [the] FCC to dismiss a challenge where the challenging party has seriously questioned the validity of a representation and the defending party is the party with access to the relevant information." *CPBF*, 752 F.2d at 679; *see also Citizens Committee to Save WEFM v. FCC*, 506 F.2d 246, 265–66 (D.C. Cir.1974) (en banc). This principle applies in the instant case, in which the licensee had exclusive access to much of the information at issue. The petitioners have raised significant questions about Pyle's employment practices. It would be difficult, however, for them to adduce more specific evidence than they already have. This is due, in large part, to the fact that the licensee did not reveal the full names and addresses of, or other identifying information about, the terminated black employees. Without this information, the Commission has only the licensee's possibly self-serving—and sometimes inconsistent—explanations for their departure. This disparity of information between the petitioners and the licensees is particularly significant in the case of those black employees whose reason for termination was account-

ed for differently by the licensee during the course of the FCC inquiry, and those who Pyle says were terminated for "unsatisfactory performance." In light of the licensee's exclusive access to the black former employees, the Commission erred in not taking more affirmative steps to investigate the validity of the licensee's accounts.

Taken together, we believe that these factors—the sharp decline in black employment at the station and the licensee's inadequate explanation for it, the inconsistencies in Pyle's statements to the Commission, the failure to comply with EEO requirements, and the disparity in information between petitioners and the licensee—indicate that significant and material disputes of fact remain to be resolved. The Commission, for example, must evaluate and consider Pyle's contentions that the change in format led blacks to be less interested in employment at the station and that during the period from January 1, 1983 to March 15, 1984, three black males were offered employment, all of whom declined. *See* 2 FCC Rcd at 1793. Although the Commission did investigate these questions, its investigation did not go far enough. The Commission cannot be faulted for attempting initially to resolve the questions raised by petitioners through an exchange of letters. *See Bilingual*, 595 F.2d at 630 (The Commission "generally attempts to resolve the factual uncertainty by requesting further information, rather than by designating the application for an immediate renewal hearing."). But where, as here, the inquiry took almost three years from the FCC's first letter to its final order, and almost no progress was made in resolving the central factual disputes, it is clear that such a means of proceeding is no longer reasonable.

Under these circumstances, the Commission abused its discretion in issuing the license renewal. The Communications Act states that when "a substantial and material question of fact is presented," the Commission "shall formally designate the application for hearing." 47 U.S.C. § 309(e); *see also Black Broadcasting Coalition of Richmond v. FCC*, 556 F.2d 59, 64–65 (D.C.

Cir.1977). Petitioners and Pyle present sharply divergent accounts of the employment practices of the licensee, and they dispute many of the underlying facts. This court has stated previously that "the determination of which factual version is indeed accurate is precisely the function of an evidentiary hearing." *CPBF*, 752 F.2d at 680. Accordingly, we direct the Commission to hold a hearing to resolve the questions both about actual discrimination and about the licensee's failure to meet its affirmative action obligations.

*So ordered.*