**TALLAHASSEE BRANCH OF THE NAACP and the National Black Media Coalition, Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Holt–Robinson Television, Inc., Intervenor.**

**LOUISIANA STATE CONFERENCE OF BRANCHES OF THE NAACP, et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Louisiana Educational Television Authority, Intervenor.**

Nos. 88–1331, 88–1332.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 31, 1989.

Decided March 21, 1989.

---

Grover G. Hankins, Kansas City, Mo., of the bar of the U.S. Supreme Court, pro hac vice, by special leave of court, with whom David Honig was on the brief, for appellants.

David Silberman, Counsel, with whom Diane S. Killory, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, Washington, D.C., were on the brief, for appellee.

M. Scott Johnson and Lynn M. Clancy, Washington, D.C., entered an appearance for intervenor in No. 88–1331.

Steven C. Schaffer, Washington, D.C., entered an appearance for intervenor in No. 88–1332.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and REVERCOMB, District Judge.*

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

These two cases present challenges to the refusal of the Federal Communications Commission ("FCC" or "Commission") to conduct investigations or hold evidentiary hearings on appellants' complaints that two licensees violated the FCC's Equal Employment Opportunity ("EEO") rules, 47 C.F.R. § 73.2080 (1987), before granting television license renewals. *See Arkansas Educational Television Commission*, 3 F.C.C.Rcd 1923 (1988) ("*Louisiana*"); *Applications of Certain Broadcast Stations Serving Communities in the State of Florida*, 3 F.C.C.Rcd 1930 (1988) ("*Tallahassee*"). The Commission found that although the EEO programs of both licensees were deficient, neither licensee had exhibited signs of intentional discrimination that might warrant an investigation or a hearing, *see Beaumont Branch of the NAACP v. FCC*, 854 F.2d 501, 509 (D.C.Cir.

* The Honorable George H. Revercomb, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1988). The Commission granted the renewals on the condition that each licensee submit periodic EEO progress reports. We dismiss the appeals because we find that the Commission acted within its discretion in fashioning remedies for the violation of its own regulations. The Commission's explanation of its decision in *Tallahassee* not to examine the EEO practices of other stations owned by the licensee is not a model of clarity; nevertheless, because the Commission has had a consistent policy with respect to the EEO practices of stations under common ownership with a licensee, we will not disturb its decision in this case.

## I.

Appellants challenge the Commission's *Louisiana* decision in No. 88–1332, contending that the FCC erred in granting a license renewal conditioned on reporting requirements to the Louisiana State Educational Television Authority ("LETA"), which is the public broadcasting authority for the state of Louisiana. In its license renewal application, LETA admitted that due to budget cuts imposed by the state government, it had conducted no minority recruiting or job advertising beyond that performed by the state Department of Civil Service. In 1987, after a progressive decline, *see* 3 F.C.C.Rcd at 1926, LETA's minority employment statistics for the first time slipped below the Commission's internal processing guideline (50 percent of the minority percentage of the area's total labor force, *see EEO Processing Guidelines*, 46 Rad.Reg.2d (P & F) 1693 (1980)). The guideline is neither a safe harbor nor a specific statistical requirement, but rather is used by the Commission as a means of identifying those stations whose EEO performance needs to be evaluated more closely, *see Amendment of Part 73 of the Commission's Rules Concerning Equal Employment Opportunity*, 2 F.C.C.Rcd 3967, 3974 (1987) ("*EEO Rules*"). LETA asserted that it attempted to maintain systematic communication, both orally and in writing, with a variety of minority and women's organizations including the National Organization of Women, the National Association for the Advancement of Colored People, American Women in Radio and Television, and the Louisiana Women's Political Caucus. LETA promised that if its budget permitted, it would resume minority recruiting and advertising for vacancies that occurred during the next year.

LETA also disclosed that it did not have an adequate recordkeeping system for referrals, and noted that it was difficult for LETA to determine how many referrals it gained from its communications with minority organizations, and from the state civil service's recruiting efforts, because the civil service list of applicants did not indicate how they found out about the jobs. Again, LETA pledged to do better, and claimed that its recordkeeping system was being changed in order to elicit and compile such information.

The Commission granted LETA's license renewal but imposed reporting conditions "in order to monitor the licensee[']s adherence to its EEO program and its self-assessment," 3 F.C.C.Rcd at 1926. The Commission opined that "[w]hile we are not unsympathetic to the licensee's financial condition, we do not believe that budget constraints are a legitimate excuse for nonperformance of its EEO obligations," 3 F.C.C.Rcd at 1926. For example, the FCC noted that "it would not have been an unreasonable expense for the licensee to mail notices for the six vacancies in 1986 to the four recruitment sources or notify these sources by phone." 3 F.C.C.Rcd at 1928 n. 25. The Commission nevertheless found that a further investigation or hearing was unnecessary because no "substantial and material question of fact concerning LETA's EEO compliance has been raised." 3 F.C.C.Rcd at 1926.

Appellants challenge the Commission's *Tallahassee* decision, in No. 88–1331, to renew the license of Holt–Robinson Television, Inc. ("Holt"), which operates WTWC–TV in Tallahassee, Florida. The Commission found that "the station's EEO program suggests that little effort was made to apprise potential sources of minority applicants about available positions or to evaluate the productiveness of its recruitment efforts." 3 F.C.C.Rcd at 1932.

For example, although Holt's existing EEO program included recruiting efforts at Florida A & M University, a local school with a predominantly minority enrollment, no referrals were obtained from Florida A & M, *see* 3 F.C.C. Rcd at 1932. Furthermore, during the renewal process Holt proposed to *add* Florida A & M to its list of sources from whom it accepted referrals, apparently ignoring the fact that the school was *already* on its list, and suggesting that Holt previously had not engaged in serious recruiting efforts at Florida A & M.

In addition, the Commission noted that the level of minority employment at the station had decreased from 16.1 percent in 1984 to 14.3 percent in 1985 and 8.3 percent in 1986, *see* 3 F.C.C. Rcd at 1932. Minority representation in the top-four job categories had decreased from 17.9 percent in 1984 to 8.7 percent in 1985, and then increased slightly to 9.5 percent in 1986, *see* 3 F.C.C. Rcd at 1932. This meant that in some years the station was below the Commission's internal processing guideline for minority employment, because 27.6 percent of Tallahassee's labor force are minorities, *see* 3 F.C.C. Rcd at 1932. The Commission identified "the decline in minority representation at the station" as one reason it found Holt's EEO program inadequate, *see* 3 F.C.C. Rcd at 1932.

Appellants sought to introduce before the Commission the minority employment records of two AM/FM combinations owned by Holt—WHHY–AM/FM in Montgomery, Alabama, and WHSY–AM/FM in Hattiesburg, Mississippi. The FCC, however, ruled that "[s]ince the license renewal applications of these stations are not before us, this allegation will have no bearing on our review of the instant application." 3 F.C.C. Rcd at 1935 n. 17. At the same time, the Commission did not rule out considering such evidence in the future: "[w]e are not herein deciding whether poor EEO performance at any one particular station will be relevant to future license renewal evaluations for other stations licensed to the same licensee." *Id.*

The Commission therefore decided to renew Holt's license on the condition that it comply with certain reporting provisions "to assist [the Commission] in monitoring its efforts to ensure that the expanded recruitment plan is implemented and that an on-going self-evaluation is conducted." 3 F.C.C. Rcd at 1932. The Commission once again reasoned that an inadequate EEO program, by itself, did not require a hearing or further investigation.

Appellants seek review of the decisions of the FCC in each of these cases.

## II.

This court must review the Commission's determination that the license renewal proceedings present no "substantial and material question of fact," 47 U.S.C. § 309(d)(2), regarding intentional racial discrimination. The court's role in reviewing the Commission is a "limited one," *Gencom, Inc. v. FCC*, 832 F.2d 171, 181 (D.C.Cir.1987); *see also California Public Broadcasting Forum v. FCC*, 752 F.2d 670, 674–75 (D.C.Cir. 1985). "We must examine the Commission's statement of reasons for denial, and if the Commission's action was not arbitrary, capricious or unreasonable, we must affirm." *United States v. FCC*, 652 F.2d 72, 91 n. 87 (D.C.Cir.1980) (en banc). Deference is owed because a license renewal hearing "can be an unnecessarily costly and time-consuming procedure, and the Congressional purpose is to avoid such hearings wherever possible." *Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC*, 595 F.2d 621, 630 n. 34 (D.C.Cir. 1978) (en banc).

### A.

■ In *Louisiana*, appellants urge that there is a substantial and material question of fact regarding LETA's discriminatory intent. They raise two objections to the Commission's decision that further inquiry was unnecessary.

First, appellants assert that LETA used the state budget cuts as a ruse to dismantle its EEO program. According to appellants, LETA's argument that it was unable to pay for even simple EEO efforts such as $10 mailings is so transparently phony that

it provides evidence of discriminatory intent. *See California Public Broadcasting Forum v. FCC,* 752 F.2d 670, 678–79 (D.C. Cir.1985) (finding denial of hearing arbitrary and capricious where issue of misrepresentation existed). LETA undertook extensive advertising for engineers and a new executive director in trade publications and newspapers, when soliciting more minority referrals would have cost a tiny fraction of those expenditures. At a time when LETA knew that its FCC-mandated EEO efforts were inadequate, it chose to curtail those efforts for "budgetary reasons," while increasing a more elaborate advertising campaign—not required by FCC regulations—for other positions. In addition, appellants charge, LETA covered up this advertising campaign, and waited until a petition to deny had been filed before disclosing it to the Commission.

The Commission's responses to this objection are adequate to sustain its decision. First, as the FCC notes, LETA did not withhold the information from the Commission, but rather voluntarily disclosed it in its opposition to the petition to deny. From the context of the opposition, it appears that LETA did not believe that an extensive campaign for engineers and the executive director was necessarily incompatible with minority recruiting. LETA, for example, eventually hired a woman as executive director. Second, LETA justified its special advertising campaign on the ground that engineering positions historically had been difficult to fill because LETA offers lower pay than commercial broadcasters. The Commission found that this explanation was adequate. Third, LETA maintained that it relied on the state civil service, from whom it received 136 referrals, to perform EEO functions on its behalf. LETA explained that the Louisiana Department of Civil Service regularly contacted almost 700 sources, including minority recruitment sources, vocational and technical schools, state colleges with significant minority enrollments, and minority-owned newspapers. *See* 3 F.C.C. Rcd at 1926. The Commission noted that it was not possible to determine the effectiveness of civil service recruiting, since LETA kept no referral statistics, but pointed out that its imposition of reporting requirements would make such a determination feasible. The Commission's reasoning is well supported, and we uphold it.

Next, appellants contend that the statistical disparities in LETA's employment practices warrant a finding of discriminatory intent. In 1987 LETA did not meet the FCC internal processing guide for minority employment, and we have in the past viewed the *combination* of an inadequate EEO program and large statistical disparities as evidence of discriminatory intent that might require further investigation or an evidentiary hearing. *See, e.g., Beaumont,* 854 F.2d at 509; *Bilingual Bicultural Coalition,* 595 F.2d at 630.

The statistical disparities in this case, however, are not large, and the small size of the labor force involved exaggerates the effect of changes in employment. For example, LETA has six producer/reporters who work on a temporary basis and are not reported in the EEO statistics; four of these are minorities. *See* 3 F.C.C. Rcd at 1928 n. 24. The statistics upon which appellants rely, moreover, are apparently inaccurate, *see* 3 F.C.C. Rcd at 1928 n. 23, and the Commission found that, if the figures were corrected, the overall representation of minorities in the station's work force as a whole met or exceeded the FCC's processing guideline for each year of the licensing term, and that employment of minorities in the upper job categories met the guidelines in four out of the six years in the license term. In these two other years, the addition of one minority person would have permitted LETA to meet the guideline. In this case, there is not the "substantial" disparity necessary to second-guess the Commission's decision. We therefore hesitate to ascribe undue significance to what the FCC insists are "simply analytical aids" not "determinative" of discriminatory intent. 3 F.C.C. Rcd. at 1923.

### B.

In *Tallahassee,* appellants point to several features of Holt's employment practices that they claim, when combined

with its concededly defective EEO program, raise an inference of discriminatory intent. On the record before us, we must affirm the Commission's determination that no such inference is raised.

Appellants first maintain that Holt's proposal during the renewal process to add Florida A & M to its list of sources from which it accepted referrals demonstrated some form of discriminatory intent. The Commission, however, interpreted the Florida A & M affair merely as an indication that Holt's EEO program was inadequate, rather than as proof of any discriminatory intent, and the Commission's conclusion cannot be rejected as arbitrary or unsupported by the evidence. The FCC characterized the reference to Florida A & M as evidence that "the licensee was inattentive to its recruitment and self-assessment responsibilities and may not have made additional recruitment efforts absent the filing of the petition to deny." 3 F.C.C. Rcd at 1932. The Commission also noted that Holt had made a number of other positive improvements in response to the petition, such as expanding its recruitment efforts to include the NAACP and the *Capitol Outlook*, a black newspaper, *see* 3 F.C.C. Rcd at 1935 n. 19, that did not support an inference of discriminatory intent. The Commission's explanation of Holt's re-listing of Florida A & M is not unreasonable.

Appellants next charge that minority representation declined during the period under license, and that this should have given rise to a finding of discriminatory intent, or at least should have warranted an FCC staff investigation. The Commission, in contrast, found only that the decline was evidence of the failure of the EEO program. Largely for the reasons discussed *supra*, we are reluctant to place undue emphasis on the statistical disparity in minority employment, which in any case was not large; Holt had met the Commission's internal processing guidelines for 1984 and 1985 for overall minority employment, and in 1986 its minority employment in the top-four job categories, while inadequate, had increased since the year before, *see* 3 F.C.C. Rcd at 1932. As in *Louisiana*, the addition of one minority employee in the

remaining years would have brought the station into compliance with the FCC's guideline. Again, we find that the Commission's decision not to conduct an investigation or hearing was a reasonable one.

Appellants also contend that Holt exhibited discriminatory intent because it relegated minorities to entry level positions. As evidence, appellants point to Holt's EEO program submitted to the Commission, which included the following statement:

WTWC–TV has consistently encouraged minorities to apply for positions at WTWC–TV. One of the problems is that most qualified applicants leave the market to pursue larger, more lucrative markets. *When we have encouraged minorities to apply for entry-level positions,* the posture has been that the pay is too low; however, we find that on a dollar basis we are equal to other stations in the market and in general are equal to other industries in the area. However, our benefits fall slightly short of others['] and we are presently rev[ie]wing this.

Joint Appendix at 16 (emphasis added).

Appellants allege that the italicized language indicates that Holt encouraged minorities to apply only for entry-level positions, a practice which would have been in clear violation of the EEO program, *see Rust Communications Group, Inc.,* 53 F.C.C.2d 355, 363–64 (1975). Appellants maintain that this possibility is particularly disturbing in light of the fact that for three years during the license term, the only upper-level job for which Holt hired any minorities was the position of technician.

We find, however, that Holt's statement does not mean that it encouraged employees to apply *only* for entry-level positions, merely that *when* it did so, it discovered that its pay was too low. The first sentence is not limited to entry-level positions and implies that Holt encouraged minority applications for all jobs, regardless of level. Appellants' tacit argument, that Holt has too few minorities in top-level positions, was considered and rejected by the Commission, *see* 3 F.C.C. Rcd at 1932, and is not

formally appealed by appellants. We also note that appellants' claim that Holt's statement is evidence of discriminatory intent was not raised before the Commission below (appellants suggested merely that it demonstrated the defect in Holt's EEO program, not that it indicated any intent, *see* Joint Appendix at 26). Technically, we are jurisdictionally barred from considering it, *see* 47 U.S.C. § 405.

■ Finally, appellants argue that the minority employment records of two AM/FM combinations owned by Holt— WHHY–AM/FM in Montgomery, Alabama, and WHSY–AM/FM in Hattiesburg, Mississippi—should have been considered by the FCC, because these records suggest that Holt has consistently violated EEO policy wherever it has operated. Arguably, such a practice might give rise to an inference of discriminatory intent.

The Commission did not consider this evidence, on the ground that the renewal applications of these other stations were not then before it. *See* 3 F.C.C. Rcd at 1935 n. 17. This excuse, however, is too facile because the three licenses will *never* all be before the Commission at the same time. In addition, the cases cited by the FCC in its decision are clearly inapposite to the instant case. In *Chicago Metropolitan Broadcast Stations*, 89 F.C.C.2d 1031, 1034 (1982), the Commission ruled that it need not conduct a "marketwide inquiry" into "the utilization of Hispanics in the Chicago radio industry" as a whole. Similarly, *Richey Airways, Inc.*, 53 Rad.Reg.2d (P & F) 330, 338 n. 20 (1983), held only that the FCC need not embark on a marketwide survey of employment practices in Roanoke, Virginia, Lubbock, Texas, and north-central Ohio. Neither case speaks to a comparison of the employment practices of stations in different markets under the ownership of the *same licensee*. In *Equal Employment Violations*, 56 Rad.Reg.2d (P & F) 445, 447 (1984), the Commission rejected a mid-term petition to deny a license while there was no ongoing renewal proceeding. Crucially, however, that case does *not* hold that a licensee's mid-term performance can have no collateral evidentiary weight in a review of co-owned facilities.

The Commission now argues that it did not consider the evidence because it was incomplete and therefore not probative of discriminatory intent. This argument, however, is a pure *post hoc* rationalization and was not mentioned in the Commission's decision below. In addition, the fact that evidence is *incomplete* is a curious basis on which to deny a hearing or investigation, *see Citizens for Jazz on WRVR, Inc.*, 775 F.2d 392, 397 (D.C.Cir.1985) ("It would be peculiar to require, as a precondition for a hearing, that the petitioner fully establish * * * what it is the very purpose of the hearing to inquire into.").

If the Commission insists on burying important explanations of its actions in footnotes, it should at least discuss more fully its policy of not considering evidence of EEO practices at stations under common ownership. We conclude that we must nonetheless uphold the Commission's decision in this case because it has had a consistent policy in connection with common ownership, and we must defer to its discretion in determining how it will enforce its own EEO regulations. *See EEO Rules*, 2 F.C.C. Rcd at 3974 (focusing on employment record of individual station). An agency's interpretation of its own regulations is entitled to great weight, *see Stuart–James Co., Inc. v. Securities and Exchange Commission*, 857 F.2d 796, 800 (D.C.Cir.1988). Appellants can point to no specific regulation *mandating* that the Commission examine the EEO practices of co-owned stations in every case, and we cannot say that the FCC's construction of its rules not to require such a result is "plainly erroneous or inconsistent with the regulation," *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (*quoting Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Appellants' argument that prior Commission practice requires it to consider the information they offer in this case fails, because the instances cited by appellants are inapposite. *See Georgia State Board of Education*, 70 F.C.C.2d 948, 967 (1979) (consid-

ering, in licensing renewal proceeding of state-operated station, EEO practices of other state-operated stations subject to the same state hiring procedures); *Town and Country Radio, Inc.*, 53 F.C.C.2d 401, 406–07 (Rev.Bd.1975) (using EEO data from applicant's prior stations in initial licensing decision). We therefore uphold the Commission's interpretation of its regulations in this case.

### III.

In dismissing the appeals, we do not diminish the importance of appellants' concerns. Noncompliance with the EEO rules is a very serious matter, even in the absence of any signs of intentional discrimination. We hold only that the selection of the particular remedies chosen by the Commission to redress violations of its own regulations was not arbitrary, based on the record before us. The decisions of the Commission are

*Affirmed.*