40 F.3d 474
 309 U.S.App.D.C. 218
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
 FLORIDA STATE CONFERENCE OF BRANCHES of the NAACP; the
Tallahassee Branch of the N.A.A.C.P.; The Volusia
County Branch of the N.A.A.C.P.; The
Lakeland Branch of the
N.A.A.C.P., Appellants.
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Chapman S. Root 1982 Living Trust, Intervenor.
 
 Nos. 92-1546, 93-1459.
 United States Court of Appeals, District of Columbia Circuit.
 Oct. 14, 1994.
 Before: WALD, WILLIAMS and HENDERSON, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This cause came to be heard on appeal from orders of the Federal Communications Commission, and it was briefed and argued by counsel. The issues have been accorded full consideration by the Court and occasion no need for a published opinion. See D.C.Cir.Rule 14(c). For the reasons stated in the accompanying Memorandum, it is
 
 
 2
 ORDERED and ADJUDGED, by the Court, that in Nos. 92-1546 and 93-1459, the orders of the Federal Communications Commission are affirmed.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely-filed petition for rehearing. See D.C.Cir.Rule 15.
 
 ATTACHMENT
 MEMORANDUM
 
 4
 Appellants Florida State Conference of Branches of the NAACP and its Lakeland and Volusia County Branches ("the NAACP") appeal from orders of the Federal Communications Commission ("FCC" or "Commission") awarding broadcast license renewals to the Chapman S. Root Revocable Trust ("Root") for radio stations WNDB-AM/WWLV-FM, Daytona Beach, Florida, and WLKF-AM/WEZY-FM, Lakeland, Florida, and permitting the Chapman S. Root Revocable Trust to assign these licenses to the Chapman S. Root 1982 Living Trust ("Root"). The NAACP argues that the FCC failed to conduct a meaningful investigation of serious allegations that Root engaged in racial discrimination in employment, in violation of the FCC's Equal Employment Opportunity Rule, 47 C.F.R. Sec. 73.2080 ("EEO Rule").
 
 I. BACKGROUND
 
 5
 The FCC's EEO Rule requires each broadcast licensee with more than five employees to comply with both nondiscrimination and affirmative action requirements in recruitment, hiring, working conditions, promotion, placement, seniority, and compensation. In addition, the EEO Rule requires each such licensee to submit annual employment reports ("annual reports") enumerating staff members by race, sex, and job category; and to submit an equal opportunity program report ("EEO report") with its license renewal application.
 
 
 6
 The Chapman S. Root Revocable Trust acquired radio station WLKF-AM (Lakeland) in November, 1983; WEZY-FM (Lakeland) in May, 1984; and WNDB/WWLV (Daytona Beach) in January, 1984. License terms for all these stations expired January 31, 1989. Root applied for license renewals on September 29, 1988, and with its applications submitted the required FCC Form 396, outlining its EEO program. Root had previously submitted all required annual reports.
 
 
 7
 On January 3, 1989, the NAACP filed a petition to deny the renewal applications of 53 Florida radio stations, including WNDB/WWLV and WLKF/WEZY, based on statistical analyses of the stations' employment records and examinations of their annual reports, EEO reports, and relevant labor market data. The NAACP contended that statistical disparities between Root's record of employing minorities and minority participation in the relevant labor forces, combined with EEO program deficiencies, amounted to a prima facie showing of intentional racial discrimination in violation of the EEO rule, necessitating an evidentiary hearing.
 
 
 8
 In response to the NAACP's petition, the FCC staff initiated an investigation by writing to Root's stations to request additional information concerning their hiring records and EEO programs. Root provided most of the requested information, but was unable to provide a full accounting of the race of all job applicants. The FCC concluded on the basis of Root's applications, EEO reports, annual reports, responses to FCC staff inquiries, pleadings by the NAACP and Root, and relevant labor force data that, although there were clear deficiencies in Root's EEO recordkeeping, self-assessment, and minority recruitment efforts, each of these stations had recruited, hired, and employed some minority employees among their relatively small staffs over the license term, and the NAACP had not made out a prima facie showing of intentional discrimination sufficient to require further inquiry or an evidentiary hearing. The FCC therefore declined to conduct an evidentiary hearing or to follow up on some questions which remained partially unanswered from the staff inquiries because the stations apparently had simply failed to keep the relevant data; instead, it granted license renewals conditional upon additional detailed EEO reporting requirements, and in the case of the Daytona Beach stations, WNDB/WWLV, assessed a $5,000 forfeiture for EEO deficiencies. Applications of Certain Broadcast Stations Serving Communities in the Sarasota, Florida Area and Other Florida Communities, 5 F.C.C.Rcd 5683 (1990) ("Sarasota "); Applications for Renewal of License of Certain Broadcast Stations Serving Melbourne, Florida and Other Communities in the Florida Area, 5 F.C.C.Rcd 6738 (1990) ("Melbourne "). The NAACP petitioned for reconsideration, and the FCC denied this petition. 7 F.C.C.Rcd 6045 (1992) ("Reconsideration Order ").
 
 
 9
 The NAACP subsequently petitioned on identical grounds for denial of Root's application to assign its licenses to the Chapman S. Root 1982 Living Trust. The FCC also denied this petition. Chapman S. Root Revocable Trust, 8 F.C.C.Rcd 4223 (1993) ("Assignment Order ").
 
 
 10
 Stations WNDB/WWLV serve the Daytona Beach Metropolitan Statistical Area, the population of which is 12.9% minority (10.5% Black, 1.6% Hispanic, 0.5% Asian/Pacific Islander, 0.3% Native American). The stations' annual employment report for 1988 lists one minority employee (a Black woman) out of 26 full-time employees (3.8%) and 22 "upper-level" (managerial, professional, technical, and sales) employees (4.5%); for 1987, one Black woman out of 27 full-time (3.7%) and 24 upper-level (4.2%) employees; for 1986, no minority employees; and for 1985, one Hispanic among 24 full-time (4.2%) and 22 upper-level (4.5%) employees. Sarasota, 5 F.C.C.Rcd at 5688 n. 14.
 
 
 11
 Stations WLKF/WEZY serve the communities of Lakeland and Polk County. The available labor force in Polk County is 17.6% minority (13.9% Black, 3.1% Hispanic, 0.3% Asian/Pacific Islander, 0.3% Native American). The stations' annual employment report for 1988 lists two minority employees, a Black and a Native American, among 23 full-time (8.9%) and 21 upper-level (9.5%) employees; for 1987, two Blacks and a Native American among 28 full-time (10.7%) and 26 upper-level (11.5%) employees; for 1986, one Black and one Native American among 30 full-time (6.7%) employees, and one Native American among 24 upper-level (4.2%) employees; and for 1985, one Black and one Native American among 28 full-time (7.1%) and 23 upper-level (8.7%) employees. Melbourne, 5 F.C.C.Rcd at 6742 n. 10.
 
 
 12
 The NAACP contends that these figures, although unimpressive, nonetheless overstate Root's minority employment record because the figures are based solely on employment in full-time positions; adding part-time employees would further reduce Root's minority employment percentages. Appellants' Brief at 25.
 
 II. DISCUSSION
 
 13
 The NAACP argues that the FCC failed to conduct a meaningful investigation of the NAACP's charges of intentional racial discrimination, which were based upon statistical discrepancies between the stations' employment records and percentages of minorities in the relevant labor markets. The NAACP further contends that the FCC failed to take account of other "relevant factors" including deficiencies in Root's EEO recordkeeping, and failed to include (or to require Root to include) part-time employees in its EEO statistics. Finally, the NAACP argues that the FCC failed to rationally explain how it concluded there was no "substantial and material issue" of intentional discrimination from the evidence presented on the record.
 
 
 14
 The FCC replies that it did investigate the NAACP's allegations, and upon inquiry found no substantial and material issue of intentional discrimination. This conclusion, the FCC says, was rationally based on evidence that the stations in question did recruit, hire, and employ some minority employees during the license terms in question, most of them in professional, technical and managerial positions; there were no allegations of overt discrimination against individuals; and the stations' hiring records were generally comparable to those of other licensees whose licenses had been renewed. Furthermore, the FCC did find deficiencies in the licensee's EEO programs and as a result granted license renewals subject to additional reporting requirements and, with regard to two of the stations, a $5,000 forfeiture. The FCC asserts that this treatment accords with the requirements of past cases like Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC, 595 F.2d 621 (D.C.Cir.1978), Beaumont Branch of the NAACP v. FCC, 854 F.2d 501 (D.C.Cir.1988), and Black Broadcasting Coalition of Richmond v. FCC, 556 F.2d 59 (D.C.Cir.1977), and with past agency practice in similar cases.
 
 
 15
 The NAACP's statistical analyses do show substantial disparities between Root's employment record and the percentage of minorities in the relevant labor markets. However, we do not agree that these disparities, even in combination with other alleged EEO deficiencies, compel an inference of intentional discrimination.
 
 
 16
 It is well-established that our review of the FCC's determinations as to what threshold showing of racially discriminatory employment practices will trigger further inquiry, and what form such further inquiry (if any) will take, is "particularly deferential," both because it requires an open-ended discretionary judgment as to enforcement priorities appropriate for agency determination, and because "Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings in this field whenever possible." Citizens for Jazz on WRVR, Inc. v. FCC, 775 F.2d 392, 398 (D.C.Cir.1985) (internal quotation and citation omitted); see also National Black Media Coalition v. FCC, 775 F.2d 342, 358 (D.C.Cir.1985) ("Evidence of statistical disparity is not, in and of itself, sufficient grounds for this court to order the FCC to conduct a hearing," and "the agency may take any action, including holding a hearing, that it deems appropriate, provided that it acts rationally and provides adequate explanations for its actions."). The FCC has "broad discretion in determining whether to hold a hearing in conjunction with a license renewal," and we "will not interfere with an agency's decision not to hold a hearing if it is reasonable and supported by the evidence before it." Beaumont Branch of the NAACP v. FCC, 854 F.2d at 507.
 
 
 17
 As we noted in Beaumont, "the FCC has taken different approaches to enforce its anti-discrimination and affirmative action requirements." 854 F.2d at 507. The affirmative action prong of the EEO policy is prospective, rarely triggers license renewal hearings, and is generally applied through prospective remedies such as short-term license renewals or renewals contingent upon EEO progress reports. Id. It is typically enforced through procedural obligations and administrative sanctions. See Florida Conference of Branches, NAACP v. FCC (WLVU), 24 F.3d 271, 274 (D.C.Cir.1994); National Black Media Coalition, 775 F.2d at 357; Bilingual, 595 F.2d at 628. By contrast, the anti-discrimination prong of the EEO policy is aimed at making whole the victims of past acts of intentional discrimination, and will trigger a hearing "[w]hen a responsible and well-pleaded claim of discrimination has been made." Beaumont, 854 F.2d at 507. A petition to deny license renewal must meet three conditions before a hearing is required: first, the petition "must show the necessary specificity and support; mere conclusory allegations are not sufficient"; second, "the dispute must be a factual one, rather than a disagreement over the proper interpretation to be given to agreed upon facts"; and third, "even if the facts are in dispute, a hearing is required only if the issue is material and substantial," id., citing California Public Broadcasting Forum v. FCC, 752 F.2d 670, 674 (D.C.Cir.1985), taking into account not only the petitioner's allegations but all the evidence before the Commission, Beaumont, 854 F.2d at 507.
 
 
 18
 Here, although the NAACP's petition was based upon specific factual allegations, the dispute centers in large part on "the proper interpretation to be given" to statistical employment disparities and conceded deficiencies in the stations' EEO compliance. The NAACP argues that an inference of intentional discrimination was compelled by the evidence it produced; the FCC essentially argues that even if the evidence is consistent with an inference of intentional discrimination, it is also consistent with the inference that there was no intentional discrimination at play. Applying the highly deferential standard appropriate here, we cannot conclude that the FCC's threshold determination that there was no substantial and material issue of intentional discrimination was so irrational, unreasonable, unexplained, or lacking support in the whole record as to require reversal.
 
 
 19
 The NAACP argues that the FCC offered "irrational reasons" for rejecting an inference of racial discrimination from the NAACP's statistical analyses. The FCC explained that the NAACP's statistics "are not based on the Commission's EEO guidelines but, as indicated by the NAACP, are based on computations used in cases brought under Title VII"; and further, that the NAACP had not met its burden of showing that granting renewal was "prima facie inconsistent with the public interest" "simply by stating that discrimination cannot be ruled out" based solely on its statistical analysis. Reconsideration Order, p 5, Joint Appendix ("J.A.") 407. While hardly a model of clarity, this statement does offer rational reasons, supported in the record, for the FCC's determination that there was no showing of intentional discrimination sufficient to require further inquiry.
 
 
 20
 We need not dwell on the first part of the FCC's argument--essentially, that the NAACP relied on inappropriate statistical measures. Reviewing the FCC's decision as to what statistical measures are appropriate under the same highly deferential standard we apply elsewhere, we recently upheld the FCC's conclusion that Title VII-type statistics are not an appropriate basis for measuring a station's compliance with the FCC's EEO rule. Florida State Conference of Branches, NAACP v. FCC (WLVU), 24 F.3d at 274 n. 4. But whatever statistical yardstick is used, the NAACP's challenge also fails under the second part of FCC's reasoning, that an inference of racial discrimination is not compelled by the mere conclusion that racial discrimination "cannot be ruled out." The NAACP itself concedes that its inference of intentional discrimination is based on the conclusion that the statistical disparity cannot be explained "by chance," J.A. 169, and that therefore "discrimination cannot be ruled out." J.A. 178, 186. But we have upheld the Commission's conclusion that there was no intentional discrimination even when the statistical disparities were greater than those present here, so long as the Commission offered a rational explanation, supported by the record, for so concluding. See Florida State Conference of NAACP v. FCC (WLVU), 24 F.3d at 274 (Commission could rationally conclude that distance from urban areas where minority labor force was concentrated, rather than intentional discrimination, accounted for station's record of hiring no minorities). Here, as the FCC notes, the stations have quite consistently hired and retained some minority employees over the course of the license term, in not wholly insignificant numbers. In the light of evidence of some hiring and ongoing employment of minorities, the NAACP's statistics certainly do not compel an inference of intentional racial discrimination; indeed, consistent hiring of minority employees provides some evidence of an absence of discriminatory intent. It is thus not irrational for the FCC to infer that the stations' minority employment record may be due to factors other than intentional discrimination. One such factor may be simple inattentiveness to the affirmative action requirements of the FCC's EEO policy--a condition the FCC sought to remedy through fines and license renewals made contingent upon additional EEO reporting requirements, consistent with its treatment of similar cases in the past, see, e.g., Colonial Broadcasting, Inc., 5 F.C.C.Rcd 191 (1990); Dwyer Broadcasting, Inc., 4 F.C.C.Rcd 6178 (1989). Although the NAACP argues that the stations' EEO deficiencies lend further credence to an inference of intentional discrimination, cf. Bilingual, 595 F.2d at 630 (statistical disparities combined with a deficient EEO program may give rise to an inference of intentional discrimination), we think the FCC's view is equally plausible under the facts of this case: ironic as it may appear at first blush, Root's EEO deficiencies may actually support an inference of an absence of intentional discrimination. Given statistical discrepancies, coupled with a consistent pattern of some minority hiring and concededly deficient affirmative action efforts, one rational and plausible explanation is that simple inattentiveness to minority recruitment, EEO recordkeeping, self-assessment, and other EEO requirements, rather than intentional discrimination, accounts for the statistical disparities. On this view, the FCC's conclusion that there was no substantial and material issue of intentional discrimination was rational, adequately explained, and supported by the record. Moreover, the FCC's remedial measures dovetail cleanly with its factual determinations, and indeed may do more to promote minority hiring at these stations than holding these licenses hostage while the parties wrangle over past discriminatory intent. Cf. National Organization for Women v. FCC, 555 F.2d 1002, 1017 (D.C.Cir.1977) (FCC enforcement "seek[s] to lead a licensee ... to adopt policies ensuring an active recruitment program and genuine equal employment opportunity in the future.") (internal quotation and citation omitted). Finally, the FCC's ultimate disposition of this case--addressing Root's EEO deficiencies by conditioning license renewals on additional EEO reporting requirements--squares with the Commission's treatment of other similarly-situated licensees. While not dispositive, conformity with a consistently applied policy carries some weight in our determination that the action was neither arbitrary nor capricious. See Tallahassee Branch of the NAACP v. FCC, 870 F.2d 704, 710 (D.C.Cir.1989) (upholding FCC decision "because it has had a consistent policy" and is entitled to deference in "determining how it will enforce its own EEO regulations"). Perhaps the FCC has stated its reasons inartfully in this case, but at the end of the day it has offered explanations sufficiently rational and with adequate support in the record to withstand judicial scrutiny under the deferential standard we apply in this case.
 
 
 21
 Nor do we agree with the NAACP's contention that the FCC may not rationally rely solely on records of employment in full-time positions, to the exclusion of part-time employment, in evaluating stations' performance under the EEO rule. It may be true, as the NAACP suggests, that part-time jobs are especially important to entry-level minority employees because they provide invaluable training and experience that may eventually lead to full-time work. But the FCC's conclusion that full-time employment is a better ultimate gauge of EEO performance,[1] and its decision to concentrate its limited enforcement resources on ensuring compliance at that level, are sufficiently rational and adequately explained to pass our review. We will not second-guess agency actions that surpass this low threshold of judicial inquiry.
 
 
 22
 In its appeal of the FCC's license assignment order, No. 93-1459, the NAACP offers no additional grounds for reversal beyond those already decided in connection with its appeal of the license renewal orders, No. 92-1546.
 
 
 23
 For the foregoing reasons, we hereby affirm the orders of the Federal Communications Commission.
 
 
 24
 It is so ordered.
 
 
 
 [1]
 The NAACP itself concedes this point elsewhere in this record. See NAACP comments on licensees' responses to FCC staff inquiries, J.A. 172 ("The hiring of a parttime employee--whose hours may be quite minimal--generally says little about the willingness of an employer to practice nondiscrimination or affirmative action.")